**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-3681
_____

FREE SPEECH COALITION, INC.; AMERICAN
SOCIETY OF MEDIA PHOTOGRAPHERS,
INC.; THOMAS HYMES; TOWNSEND
ENTERPRISES, INC., d/b/a SINCLAIR INSTITUTE;
BARBARA ALPER; CAROL QUEEN; BARBARA
NITKE; DAVID STEINBERG; MARIE L.
LEVINE, a/k/a NINA HARTLEY; DAVE
LEVINGSTON; BETTY DODSON; CARLIN ROSS,
                                        Appellants

v.

ATTORNEY GENERAL UNITED STATES OF
AMERICA
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No. 2-09-cv-04607
District Judge: The Honorable Michael M. Baylson

Argued December 9, 2015

Before: SMITH, SCIRICA, and RENDELL,
*Circuit Judges*

(Filed: June 8, 2016)

Lorraine R. Baumgardner, Esq.
J. Michael Murray, Esq.                    [ARGUED]
Berkman, Gordon, Murray & DeVan
55 Public Square
Suite 2200
Cleveland, OH  44113

Kevin E. Raphael, Esq.
J. Peter Shindel, Jr., Esq.
Pietragallo, Gordon, Alfano, Bosick & Raspanti
1818 Market Street
Suite 3402
Philadelphia, PA  19103
        *Counsel for Appellant*

Hector Bladuell, Esq.
James J. Schwartz, Esq.
Nathan M. Swinton, Esq.
Kathryn Wyer, Esq.
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.

Room 7130
Washington, DC  20530


Scott R. McIntosh, Esq.
United States Department of Justice
Civil Division
Room 7259
950 Pennsylvania Avenue, N.W.
Washington, DC  20530

Anne Murphy, Esq.                    [ARGUED]
United States Department of Justice
Appellate Section
7644
950 Pennsylvania Avenue, N.W.
Washington, DC  20530
        *Counsel for Appellee*

Fred T. Magaziner, Esq.
Dechert
2929 Arch Street
18th Floor, Cira Centre
Philadelphia, PA  19104
        *Counsel for Amicus Appellant American Civil
        Liberties Union of Pennsylvania*

3

Andrew G. Crocker, Esq.
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
    *Counsel for Amicus Appellant Electronic Frontier Foundation*

_____

OPINION
_____

SMITH, *Circuit Judge.*

This case reaches us for the third time and requires us to consider the import of two recent Supreme Court cases, *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), and *City of Los Angeles v. Patel*, 135 S. Ct. 2443 (2015), on the constitutionality of the recordkeeping, labeling, and inspection requirements set forth in 18 U.S.C. §§ 2257 and 2257A (collectively, "the Statutes") and their accompanying regulations, 28 C.F.R. §§ 75.1-75.9. In light of *Reed*, we determine that the Statutes are content based, and therefore require strict scrutiny review under the First Amendment. We will remand to the District Court to determine whether the Statutes withstand strict scrutiny. In light of *Patel*, we conclude

that the inspection provisions of the Statutes[1] and 28 C.F.R. § 75.5 are facially unconstitutional under the Fourth Amendment.

## I.

Since 1984, Congress has criminalized both the commercial and noncommercial use of children in sexually explicit materials. *See Free Speech Coal., Inc. v. Att'y Gen. (FSC I)*, 677 F.3d 519, 525 (3d Cir. 2012) (describing legislative efforts to criminalize child

---

[1] By "inspection provisions" we refer to § 2257(f)(5) and § 2257A(f)(5) as well as the phrase in § 2257(c) and § 2257A(c) that requires recordkeepers to "make such records available to the Attorney General for inspection at all reasonable times." The remainder of subsection (c), which concerns the location of the records, does not violate the Fourth Amendment, and we will strike down only the offending portion on Fourth Amendment grounds. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) (internal citations and quotation marks omitted) ("A court should refrain from invalidating more of the statute than is necessary. . . . Whenever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid." (internal citations and quotation marks omitted)).

pornography). Despite these direct prohibitions on child pornography, producers of sexually explicit materials continued to utilize youthful-looking performers. *See id.* at 525-26 (citing *Attorney General's Commission on Pornography, Final Report*, 618 (1986) (the "Report")). Law enforcement was viewed as ill-equipped to visually determine these performers' ages, and, as a consequence, the risk that children were still being used in pornographic materials remained. *Id.*

In response to the Report, Congress decided to place the onus on producers to collect information demonstrating that their performers were not minors. Section 2257, as amended, was enacted as part of the Child Protection and Obscenity Enforcement Act of 1988, Pub. L. No. 100-690, § 7513, 102 Stat. 4181, 4487. The Act requires producers of visual depictions of "actual sexually explicit conduct" to keep "individually identifiable records" documenting the identity and age of every performer appearing in those depictions. 18 U.S.C. § 2257(a). Section 2257A, enacted as part of the Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 503, 120 Stat. 587, 626-29, applies similar recordkeeping requirements to producers of depictions of "simulated sexually explicit conduct." "Sexually explicit conduct" for the purposes of both § 2257 and § 2257A consists of "(i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or

6

opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2)(A); *see also* 28 C.F.R. § 75.1(n). "Simulated sexually explicit conduct" is defined as "conduct engaged in by performers that is depicted in a manner that would cause a reasonable viewer to believe that the performers engaged in actual sexually explicit conduct, even if they did not in fact do so." 28 C.F.R. § 75.1(o).[2]

Producers of visual depictions subject to the Statutes are required to examine "an identification document" for each performer and to maintain records listing each performer's name, date of birth, and any

---

[2] Certain commercial producers of simulated sexually explicit depictions, along with some commercial producers of images that depict actual lascivious exhibition of the genitals or pubic area regulated under § 2257, are exempt from these recordkeeping requirements. 18 U.S.C. § 2257A(h). These exemptions are intended to apply to industries where Congress believed that existing regulatory schemes already "adequately achieve[d] the same age-verification ends as the Statutes," such as the mainstream motion picture and television industries. *Free Speech Coal., Inc. v. Att'y Gen. (FSC I)*, 677 F.3d 519, 535 n.11 (3d Cir. 2012); *see also* 152 Cong. Rec. S8012, S8027 (July 20, 2006) (statement of Sen. Patrick Leahy).

other name that the performer has previously used. 18 U.S.C. § 2257(b); *id.* § 2257A(b). These records must be maintained at the producer's "business premises," or at any other place prescribed by regulation, and shall be made available for inspection by the Attorney General "at all reasonable times." *Id.* § 2257(c); *id.* § 2257A(c). Producers must also "affix[] to every copy" of covered depictions "in such manner and in such form as the Attorney General shall by regulations prescribe, a statement describing where the records required . . . with respect to all performers depicted in that copy . . . may be located." *Id.* § 2257(e)(1); *id.* § 2257A(e)(1).

Detailed regulations further refine the recordkeeping and labeling requirements under the Statutes. Pursuant to these regulations, producers must maintain "a legible hard copy . . . or . . . electronic copy" of the identification documents for each performer, as well as a copy of each sexually explicit depiction. 28 C.F.R. § 75.2(a)(1). If the image is published on the Internet, the records also must contain either a URL or a "uniquely identifying reference associated with the location of the depiction on the Internet." *Id.* Producers must also generate an index tying each depiction to all names used by each performer. *Id.* § 75.2(a)(2)-(3); *id.* § 75.3. In order to comply with these requirements, producers are permitted to contract with a third party. *Id.* § 75.2(h); *id.* § 75.4. Regulations further specify that a statement describing the records' location must be

affixed to each copy of a sexually explicit depiction, and they also specify the location and contents of that statement. *Id.* § 75.6; *id.* § 75.8.

The Statutes' general command that records be available for inspection "at all reasonable times," 18 U.S.C. § 2257(c); *id.* § 2257A(c), is also governed by detailed regulations. Investigators are "authorized to enter without delay and at reasonable times any establishment of a producer where records . . . are maintained to inspect during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable manner, for the purpose of determining compliance" with the Statutes. 28 C.F.R. § 75.5(a). Although inspections are to be conducted either during normal business hours or at such times that the producer "is actually conducting business" related to covered depictions, producers must nevertheless make their records available for inspection for at least twenty hours per week. *Id.* § 75.5(c).

Inspectors are further required by regulation to take several steps at the time a search is conducted to reassure producers of the lawfulness of any search. These include presenting credentials and explaining the limited nature and purpose of the inspection. *Id.* § 75.5(c)(2). The frequency of inspections is also circumscribed: only one inspection is permitted during any four-month period, unless law enforcement has "reasonable suspicion" that a violation has occurred. *Id.*

9

§ 75.5(d).  Although "inspections shall be conducted so as not to unreasonably disrupt" operations, *id.* § 75.5(c)(3), the regulations also mandate that "[a]dvance notice of record inspections shall not be given," *id.* § 75.5(b).

Failure to maintain the necessary records, to affix the necessary statement describing the records' location to each copy of a regulated depiction, or to permit a required inspection is a criminal offense.  18 U.S.C. § 2257(f); *id.* § 2257A(f).  First-time violators of § 2257 face a maximum sentence of five years' incarceration, with subsequent violations punishable by imprisonment of "not more than 10 years but not less than 2 years."  *Id.* § 2257(i).  Sentences for violations of § 2257A are capped at one year, unless the violation involves an effort to conceal a substantive offense involving the use of a minor in sexually explicit depictions, in which case the sentencing range mirrors that imposed for violations of § 2257.  *Id.* § 2257A(i).

## II.

Plaintiffs are a collection of individuals, commercial entities, and interest groups who are engaged in or represent others involved in the production of images covered under the Statutes.[3]  This case first came

---

[3] Specifically, these Plaintiffs are Free Speech Coalition, Inc., "a trade association representing more than 1,000

to us following the District Court's grant of the Government's motion to dismiss. At that time, we held that Plaintiffs stated viable as-applied and facial claims under both the First and Fourth Amendments. *See FSC I*, 677 F.3d at 535-46. Crucial to the appeal now before us, we held that the Statutes were content-neutral regulations of speech, and that their validity should be evaluated

member businesses and individuals involved in the production and distribution of adult materials"; the American Society of Media Photographers, a trade association representing photographers; Thomas Hymes, "a journalist who operates a website related to the adult film industry"; Townsend Enterprises, Inc., doing business as the Sinclair Institute, "a producer and distributor of adult materials created for the purpose of educating adults about sexual health and fulfillment"; Carol Queen, "a sociologist, sexologist, and feminist sex educator"; Barbara Nitke, "a faculty member for the School of Visual Arts in New York City and a photographer"; Marie L. Levine, also known as Nina Hartley, a performer, sex educator, and producer of adult entertainment; Betty Dodson, "a sexologist, sex educator, author, and artist"; Carlin Ross, "who hosts a website with Dodson providing individuals ashamed of their genitalia with a forum for anonymously discussing and posting images of their genitalia"; and photographers Barbara Alper, David Steinberg, and Dave Levingston. *FSC I,* 677 F.3d at 524 n.1.

11

under intermediate scrutiny for purposes of the First Amendment challenge.

In reaching this conclusion, we relied on *Ward v. Rock Against Racism*, 491 U.S. 781 (1989), and focused on the purpose of the statute—protecting children from being used in child pornography—in determining whether the Government enacted the Statutes as a means of discriminating against a form of protected speech. *FSC I*, 677 F.3d at 533 ("In other words, 'the government's purpose is the controlling consideration,' and '[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.'" (quoting *Ward*, 491 U.S. at 791-92)). In reaching the earlier decision, we also considered the opinions of the D.C. Circuit and the en banc Sixth Circuit, the two other courts of appeals to have considered the validity of § 2257. *Id.* at 530-33 (discussing *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 326-27 (6th Cir. 2009) (en banc), and *Am. Library Ass'n v. Reno*, 33 F.3d 78, 84 (D.C. Cir. 1995)).[4] In both cases, our sister circuits persuasively concluded that § 2257 was content neutral. *Connection*, 557 F.3d at 328-29 (concluding that § 2257 was content neutral because the statute had a "valid speech-related end—

---

[4] Neither *Connection* nor *American Library Association* addressed § 2257A. However, the analysis is the same.

12

eliminating child pornography—followed by a means of achieving that end, a proof-of-age requirement that refers to the content of the speech . . . not because of its effect on the audience but because it is the kind of speech that implicates the government's ban on child pornography"); *Am. Library Ass'n*, 33 F.3d at 86 ("Congress enacted [§ 2257] not to regulate the content of sexually explicit materials, but to protect children by deterring the production and distribution of child pornography.").

We agreed with our sister circuits and held that the Statutes were content neutral because "Congress enacted the Statutes for the purpose of protecting children from exploitation by pornographers," and "[a]ny impact by the Statutes on Plaintiffs' protected speech is collateral to the Statutes' purpose of protecting children from pornographers." *FSC I*, 677 F.3d at 534. Accordingly, we determined that intermediate scrutiny was appropriate. We went on to hold that Plaintiffs had stated valid as-applied and facial First Amendment claims, and remanded the case to the District Court to allow Plaintiffs "to conduct discovery and develop a record supporting their claim that the Statutes burden substantially more speech than necessary." *Id.* at 537-38.[5]

---

[5] To satisfy intermediate scrutiny, a statute must: "(1) advance[] a 'substantial' governmental interest; (2) . . . not 'burden substantially more speech than is necessary' (i.e., the statute must be narrowly tailored); and (3)

In *FSC I*, we also remanded Plaintiffs' as-applied and facial Fourth Amendment claims to the District Court. We determined that the record needed further development in order to ascertain whether the Government's behavior in conducting the inspections constituted a "search" under the Fourth Amendment. *Id.* at 544. We also held that, if the Government's conduct did qualify as a search, the record was insufficient to ascertain whether the administrative search exception to the expectation-of-privacy test was applicable. *Id.*

On remand, the District Court conducted a bench trial on Plaintiffs' remaining claims. *Free Speech Coal., Inc. v. Holder (FSC II)*, 957 F. Supp. 2d 564 (E.D. Pa. 2013). It concluded that the Statutes and regulations passed constitutional muster with one exception: inspections without prior notice to examine records located in private residences violated the Fourth

_____

leave[] open 'ample alternative channels for communication.'" *FSC I*, 677 F.3d at 535 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). In order to be narrowly tailored, a statute "need not be the least restrictive or least intrusive means" of achieving the governmental interest. *Ward*, 491 U.S. at 798. In *FSC I*, Plaintiffs "concede[d] that protecting children from exploitation by pornographers is an important, indeed compelling, governmental interest." 677 F.3d at 535 (internal quotation marks omitted).

14

Amendment. *Id.* at 607-08. The parties developed the factual record with an understanding that "the [First Amendment] question before the court with respect to narrow-tailoring is whether the Statutes burden substantially more of Plaintiffs' speech than is necessary to further the government's legitimate interest of protecting our children." *Id.* at 589 (internal quotation marks omitted). In other words, the parties focused on whether the Statutes survived intermediate scrutiny. The parties similarly developed the record for the facial overbreadth claim with an eye towards intermediate scrutiny, because the overbreadth doctrine requires "that the statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *FSC II*, 957 F. Supp. 2d at 593-94 (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)).

This case then came to us again. *Free Speech Coal., Inc. v. Att'y Gen. (FSC III)*, 787 F.3d 142 (3d Cir. 2015), *vacated and reh'g granted*, 2015 U.S. App. LEXIS 15448 (3d Cir., Sept. 01, 2015). We relied heavily on the extensive record developed in the District Court, and we affirmed the District Court's conclusion that the Statutes and regulations satisfied intermediate scrutiny under the First Amendment.[6] However, in doing

---

[6] We also concluded that Free Speech Coalition and the American Society of Media Photographers lacked

so, we noted that the Statutes may not have been able to survive strict scrutiny. Specifically, we "reject[ed] the Government's contention that age verification of all performers regardless of their actual age always furthers the Government's interest in preventing the sexual exploitation of minors." *Id.* at 156. Moreover, "the number of performers to whom the Statutes apply, yet for whom requiring identification does not protect children, is not insignificant." *Id.* at 158. Nonetheless, the Statutes satisfied intermediate scrutiny because, unlike strict scrutiny, "the Government need not employ the least restrictive or least intrusive means." *Id.* at 157. We also affirmed the District Court's conclusion that the Statutes were not facially overbroad, as "the invalid applications of the Statutes that Plaintiffs have demonstrated still pale in comparison with the Statutes' legitimate applications." *Id.* at 164. Their "broad legitimate sweep and the Government's exceedingly compelling interest in this case counsels against facial overbreadth." *Id.* at 166.

After concluding that Plaintiffs had standing to pursue injunctive relief as to their Fourth Amendment claims, *id.* at 167-68, we held that the warrantless

---

associational standing to bring as-applied claims on behalf of the entire adult film industry. *Free Speech Coal., Inc. v. Att'y Gen. (FSC III)*, 787 F.3d 142, 153-54 (3d Cir. 2015).

16

inspection regime detailed in 28 C.F.R. § 75.5 was unconstitutional as applied to Plaintiffs, *id.* at 172-73. We first determined that the production of sexually explicit images was not a "closely regulated" industry such that the administrative search exception to the warrant requirement was applicable. *Id.* at 170-71. We also held that, even if this was a closely regulated industry, the warrantless inspection provision was unnecessary, and thus unreasonable, and would still not pass Fourth Amendment muster. *Id.* at 171. We saw no need to rule on the facial validity of 28 C.F.R. § 75.5 or address the constitutionality of the inspection provisions of the Statutes themselves. *Id.* at 169 n.21.

We decided *FSC III* on May 14, 2015. Two intervening Supreme Court cases now lead us to revisit our prior holdings in this case. Specifically, *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), requires us to take another look at our holding that intermediate scrutiny applies to the First Amendment analysis, and *City of Los Angeles v. Patel*, 135 S. Ct. 2443 (2015), requires us to reconsider our holding concerning the constitutionality of the inspection provisions.

17

## III.

In light of *Reed* and *Patel*, Plaintiffs filed a petition for rehearing. After receiving a response from the United States, and a reply to the response from Plaintiffs, we vacated our judgment and opinion in *FSC III* and granted the request for a rehearing. As a result of *Reed*, we now determine that the Statutes are subject to strict scrutiny because they are content-based restrictions of speech. As a result of *Patel*, we determine that the inspection provisions of the Statutes and § 75.5 are facially unconstitutional under the Fourth Amendment.

## IV.

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review legal questions *de novo*, including the constitutionality of the Statutes and regulations at issue here. *ACLU v. Mukasey*, 534 F.3d 181, 186 (3d Cir. 2008). The court's factual findings following a bench trial are typically reviewed for clear error. *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 514 (3d Cir. 2012) (citing *Am. Soc'y for Testing & Materials v. Corrpro Cos.*, 478 F.3d 557, 566 (3d Cir. 2007)).

## V.

*Reed* requires us to reconsider our determination in *FSC I* that the Statutes are content neutral, which in turn impacts our decision in *FSC III* that the Statutes survive intermediate scrutiny. In *Reed*, the Supreme Court addressed the validity of a sign code that banned the display of outdoor signs anywhere in town without a permit, but exempted twenty-three classes of signs from this requirement. 135 S. Ct. at 2224. The Court focused on three classes of signs that received varying levels of preferential treatment under the code: ideological signs, political signs, and temporary directional signs. *Id.* at 2224-25. Plaintiffs in the case challenged the less preferential treatment given to temporary directional signs. *Id.* at 2224.

The Court of Appeals for the Ninth Circuit determined that the Sign Code was content neutral. *Reed v. Town of Gilbert*, 707 F.3d 1057, 1072 (9th Cir. 2013). That court declared that "Gilbert did not adopt its regulation of speech because it disagreed with the message conveyed," and its "interests in regulat[ing] temporary signs [were] unrelated to the content of the sign." *Id.* at 1070-71. In reaching this conclusion, the Ninth Circuit quoted language from *Hill v. Colorado*, 530 U.S. 703 (2000), and *Ward*, the Supreme Court case we relied on in *FSC I* when we determined that the Statutes were content neutral:

19

Furthermore, in *Hill*, the Supreme Court explained why a statute, which only restricted certain types of speech-related conduct, is properly considered content neutral. The Court reiterated that "[t]he principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Hill*, 530 U.S. at 719, 120 S. Ct. 2480 (quoting *Ward*, 491 U.S. at 791).

*Reed*, 707 F.3d at 1071.

The Supreme Court reversed and ruled that the "Sign Code is content based on its face," because the restrictions "depend entirely on the communicative content of the sign." *Reed*, 135 S. Ct. at 2227. Thus, strict scrutiny, not intermediate scrutiny, was the appropriate standard, as it was error to look to the purpose of the Sign Code in determining the level of scrutiny that should be applied. *Id.* at 2228. The Court instructed that "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)). "In other words, an

20

innocuous justification cannot transform a facially content-based law into one that is content neutral." *Id.* The Supreme Court further clarified that *Ward*'s inquiry into the purpose of a law applies only if the law is content neutral on its face. *Id.* at 2228-29 ("But *Ward*'s framework 'applies only if a statute is content neutral.'" (quoting *Hill*, 530 U.S. at 766 (Kennedy, J., dissenting))).

Under *Reed*, in determining whether the Statutes are content based or content neutral for purposes of our First Amendment analysis—and thus subject to strict versus intermediate scrutiny—our first step must be to conduct a facial examination of the Statutes. *Id.* at 2228 (stating that the "first step in the content-neutrality analysis [is] determining whether the law is content neutral on its face"). Only if a law is content neutral on its face may we then look to any benign purpose. *Id.* ("That is why we have repeatedly considered whether a law is content neutral on its face *before* turning to the law's justification or purpose."). The prime example of an appropriate examination of a law's benign purpose is *Ward* itself, which involved a facially content-neutral ban on the use of private sound amplification systems in a city-owned music venue. 491 U.S. at 787, 788 n.2. Only because the regulation was content neutral on its face did the Supreme Court look to the purpose of the regulation, which was noise control. *Id.* at 792.

Here, each of the Statutes we review is clearly content based on its face. The Statutes apply only to

21

"visual depictions . . . of actual sexually explicit conduct," 18 U.S.C. § 2257, and of "simulated sexually explicit conduct," 18 U.S.C. § 2257A; *see United States v. Playboy Entm't Grp.*, 529 U.S. 803, 811 (2000) (holding that a statute was content based because it "applies only to channels primarily dedicated to sexually explicit adult programming or other programming that is indecent" (internal quotation marks omitted)). Thus, under *Reed*, strict scrutiny applies because the Statutes' restrictions "depend entirely on the communicative content" of the speech. 135 S. Ct. at 2227.

The United States concedes that, in light of *Reed*, our analysis in *FSC I*, which relied on *Ward*, cannot stand.[7] Instead, in an attempt to avoid the high hurdle of strict scrutiny, the Government argues that the secondary effects doctrine of *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), and the intermediate scrutiny that applies in such cases, is applicable here. The Government is wrong.

---

[7] Our sister circuits have also noted that *Reed* represents a drastic change in First Amendment jurisprudence. *See, e.g., Cahaly v. LaRosa*, 796 F.3d 399, 405 (4th Cir. 2015) (noting that *Reed* "conflicts with, and therefore abrogates, our previous descriptions of content neutrality"); *Norton v. City of Springfield*, 806 F.3d 411, 412 (7th Cir. 2015) (noting that *Reed* understands content discrimination differently" than the prior panel decision).

22

The secondary effects doctrine requires a court to conclude that a statute is content neutral, even when on its face it draws a distinction based on content, if the court determines that the statute targets the adverse secondary effects of protected speech and not the speech itself. *Id.* at 47 (reasoning that a local zoning ordinance is content neutral even though it "treats theaters that specialize in adult films differently from other kinds of theaters"). In the most recent secondary effects case, *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 436 (2002), a plurality of the Supreme Court held that a local zoning ordinance that applied only to adult establishments was content neutral because its purpose was to reduce crime that invariably accompanied these types of establishments, not to suppress speech. Justice Kennedy, who provided the crucial fifth vote in *Alameda Books*, calls this content-neutral designation "something of a fiction," because, facially, such ordinances are "content based, and we should call them so." *Id.* at 448 (Kennedy, J., concurring in judgment). Nonetheless, he would also apply intermediate scrutiny to these commonsense regulations. *Id.* ("A zoning restriction that is designed to decrease secondary effects and not speech should be subject to intermediate rather than strict scrutiny.").

While *Reed* explicitly proscribes such an inquiry into the purpose of a facially content-based statute, 135 S. Ct. at 2228 ("A law that is content based on its face is

23

subject to strict scrutiny regardless of the government's benign motive, content-neutral justification or lack of 'animus toward the ideas contained' in the regulated speech." (quoting *Discovery Network*, 507 U.S. at 429)), we need not reach the issue of whether the secondary effects doctrine survives *Reed* because this is not a secondary effects case.

We arrive at this conclusion by recognizing that, *if* the secondary effects doctrine survives,[8] *Reed* counsels against expanding its application beyond the only context to which the Supreme Court has ever applied it: regulations affecting physical purveyors of adult sexually explicit content. *See Renton*, 475 U.S. at 45 (adult movie theater); *City of Erie v. Pap's A.M.*, 529 U.S. 277, 282

---

[8] Although we do not reach the issue, we agree with the dissent that it is doubtful that *Reed* has overturned the *Renton* secondary effects doctrine. *See BBL, Inc. v. Angola*, 809 F.3d 317, 326 n.1 (7th Cir. 2015) ("We don't think *Reed* upends established doctrine for evaluating regulation of businesses that offer sexually explicit entertainment."). Our disagreement with the dissent is, rather, about whether the secondary effects doctrine is applicable in this case.

24

(2000) (erotic dancing establishment); *Alameda Books*, 535 U.S. at 431 (adult-oriented department store).[9]

The primary justification for the secondary effects doctrine supports our narrow interpretation of the doctrine's breadth. It was originally created to ensure that local governments have the flexibility to zone their cities in a manner congruent with the "city's interest in the present and future character of its neighborhood." *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 72 (1976) (plurality). *Young*, which laid the foundation for the secondary effects doctrine in a footnote, allowed a city to enact an "Anti-Skid Row Ordinance" after determining "that a concentration of 'adult' movie theaters causes the area to deteriorate and become a focus of crime, effects which are not attributable to theaters showing other types of films." *Id.* at 71 n.34. Justice Powell, who concurred in part and in the judgment, did so because "zoning, when used to preserve the character of specific areas of a city, is perhaps 'the most essential function performed by

---

[9] We recognize that this Court has previously termed an abortion buffer zone case to be a "secondary effects case." *See Brown v. City of Pittsburgh*, 586 F.3d 263, 280 n.17 (3d Cir. 2009). *Reed* "impels us to reevaluate [*Brown*'s passage about the secondary effects doctrine] . . . because [*Reed*] weakens the conceptual underpinnings of [this passage]." *E.I. DuPont de Nemours & Co. v. United States*, 508 F.3d 126, 132 (3d Cir. 2007).

local government, for it is one of the primary means by which we protect that sometimes difficult to define concept of quality of life.'"  *Id.* at 80 (Powell, J., concurring in part and concurring in judgment) (quoting *Vill. of Belle Terre v. Boraas*, 416 U.S. 1, 81 (1976)).

*Renton* explicitly adopted the secondary effects doctrine ten years later, and the Court emphasized that a zoning scheme that preserves the quality of life for the community by restricting adult theaters to certain areas "is the essence of zoning."  475 U.S. at 54.  Furthermore, the most recent secondary effects case to come before the Supreme Court, *Alameda Books*, was also an exercise of a municipality's zoning power, as the ordinance at issue banned adult "mega stores."  The plurality opinion in *Alameda Books* placed great weight on the availability of tools for local governments to use in managing their cities.  535 U.S. at 438 (plurality) ("In *Renton*, we specifically refused to set such a high bar for municipalities that want to address merely the secondary effects of protected speech.").  Justice Kennedy's opinion concurring in the judgment, which, again, provided the crucial fifth vote, focused particularly on the role of zoning.  *Id.* at 444 (Kennedy, J., concurring in judgment) ("The law does not require a city to ignore these [adverse secondary effects] if it uses its zoning power in a reasonable way to ameliorate them without suppressing speech."); *id.* ("These secondary consequences are not always immune from regulation by zoning laws even

though they are produced by speech."). The dissent in *Alameda Books* likewise recognized the applicability of the secondary effects doctrine to the zoning context. *Id.* at 457 (Souter, J., dissenting) (recognizing that "zoning of businesses based on their sales of expressive adult material receives mid-level scrutiny").

The Supreme Court has applied the secondary effects doctrine to one case that did not involve a zoning ordinance, although that case nonetheless involved a brick-and-mortar purveyor of adult sexually explicit conduct and a local government's attempt to regulate such businesses. *See Pap's*, 529 U.S. at 282-84. In *Pap's*, the Court applied the secondary effects doctrine to an erotic dancing establishment's challenge to a local public-nudity ordinance. *Id.* at 295. The plurality concluded that "the ordinance prohibiting public nudity is aimed at combating crime and other negative effects caused by the presence of adult entertainment establishments . . . and not at suppressing the erotic message conveyed by this type of nude dancing." *Id.* at 291. Justice Stevens protested that "we have limited our secondary effects cases to zoning" because zoning regulates location as opposed to completely banning expression. *Id.* at 322 (Stevens, J., dissenting). Nonetheless, the plurality and Justice Souter's separate opinion both agreed that the secondary effects doctrine was applicable to this municipal regulation as well. *Id.* at 293 (plurality); *id.* at 312-13 (Souter, J., concurring in

27

part and dissenting in part). Thus, even taking *Pap's* into account, the secondary effects doctrine has been limited in application to the regulation of physical purveyors of adult sexually explicit speech, whether done through a city's zoning power or through another means.

We note that the Supreme Court has considered and rejected the applicability of the secondary effects doctrine to cases not involving adult physical establishments. *See Boos v. Barry*, 485 U.S. 312, 320-21 (1988) (plurality) (city ordinance prohibiting protests in front of foreign embassies); *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 430 (1993) (noting that there were "no secondary effects [arising from litter or relating to esthetics] attributable to respondent publishers' newsracks that distinguish them from the newsracks Cincinnati permits to remain on the sidewalk"); *Texas v. Johnson*, 491 U.S. 397, 412 (1989) (striking down a statute prohibiting flag burning because it was based on the reaction of others to the flag burning, which is a primary, not a secondary effect, of speech). In addition, the Supreme Court has also rejected the use of the secondary effects doctrine in the context of Internet and televised pornography. *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 815 (2000) (holding that "[o]ur zoning cases . . . are irrelevant to the question here" because the alleged secondary effect, signal bleed, was regulated due to the impact signal bleed would have on the audience, which is really a primary effect); *Reno*

28

*v. ACLU*, 521 U.S. 844, 867 (1997) (rejecting the argument that a law banning indecent or offensive speech on the Internet in order to protect children was a form of "cyberzoning").

We deem it significant that the Supreme Court has never actually *applied* the secondary effects doctrine outside the realm of brick-and-mortar purveyors of adult sexually explicit content. We decline to do so now, because any application of the secondary effects doctrine beyond what the Supreme Court has explicitly endorsed would bring this case into direct conflict with *Reed*'s pronouncement that we cannot look behind a facially content-based law to a benign motive in order to shield the law from the rigors of strict scrutiny. 135 S. Ct. at 2228 ("In other words, an innocuous justification cannot transform a facially content-based law into one that is content neutral."). Despite hints of a broadened view of the secondary effects doctrine suggested in *Boos* and similar cases, the Court's most recent pronouncement in *Reed* counsels against such a broad interpretation and we are obligated to follow its directives. *See United States v. Extreme Assoc's, Inc.*, 431 F.3d 150, 156 (3d Cir. 2005) ("[E]ven where a lower court's analytical position has merit, the obligation to follow applicable Supreme Court precedent is in no way abrogated.").[10]

---

[10] At oral argument, counsel for the Government stated that *Reed* "will be a much litigated decision" because

29

We also note that an expansion of the secondary effects doctrine beyond brick-and-mortar purveyors of adult sexually explicit conduct to other regulations, even those enacted for benign reasons, could lead to the erosion of First Amendment freedoms. *See Boos*, 485 U.S. at 337-38 (Brennan, J., concurring in judgment) (protesting the applicability of the *Renton* analysis to political speech and expressing a concern that "it could set the Court on a road that will lead to the evisceration of First Amendment freedoms"). As the Court in *Reed* recognized:

> [i]nnocent motives do not eliminate the danger of censorship presented by a facially content-based statute, as future government officials may one day wield such statutes to suppress disfavored speech. That is why the First Amendment expressly targets the operation of the laws—*i.e.*, the

"it's so broad and has impacts in many First Amendment areas." Tr. at 47:4-9. That may be so. Nonetheless, the language of *Reed* is plain. It clearly rejects any justification of a facially content-based law because of some benign purpose. If the secondary effects doctrine is going to have a broader reach, then existing jurisprudence suggests that the Supreme Court will need to take that step.

30

abridg[ement] of speech—rather than merely the motives of those who enacted them.

135 S. Ct. at 2229. To allow the secondary effects doctrine to transform a facially content-based law into a content-neutral one any time the Government can point to a laudable purpose behind the regulation that is unrelated to protected speech would render *Reed* a nullity.

We do not disagree with the dissent that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). Our disagreement is with which Supreme Court case directly controls. Because the secondary effects doctrine is inapplicable here, *Renton* does not control. Instead, we are bound by *Reed*, and although the scope of *Reed* may have broad implications for First Amendment doctrine, we must leave to the Supreme Court "the prerogative of overruling its own decisions." *Rodriguez de Quijas*, 490 U.S. at 484.

Here, the Statutes, facially, *are* content based, as they apply only to "actual sexually explicit conduct," 18 U.S.C. § 2257, and "simulated sexually explicit conduct," *id.* § 2257A. Despite the very commendable

31

purpose of seeking to prevent child pornography by making it easier for law enforcement officials to ascertain the ages of the performers in the pornographic materials, we can no longer look to the purpose of a law that draws a content-based distinction on its face in determining what level of scrutiny to apply. *See Reed*, 135 S. Ct. at 2228-29 (instructing courts to examine the purpose of a law only if the law is content neutral on its face).

Accordingly, the Statutes are subject to strict scrutiny. The Government therefore has the burden of "prov[ing] that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* at 2231.[11] Because the record in this case was developed with an understanding that the Statutes were instead subject to the lesser standard of intermediate scrutiny, we will remand to the District Court so that it can determine whether the record requires further development and whether the Statutes survive strict

---

[11] We note that Plaintiffs have conceded that the Government's interest in protecting children from sexual exploitation by pornographers is compelling, and thus the District Court's inquiry on remand should be focused on whether the Statutes are narrowly tailored to serve this interest.

scrutiny.[12]    By remanding for an application of strict scrutiny we are not "dooming" the Statutes as the dissent suggests.  Nothing in our analysis dictates a conclusion that the Statutes will not (or will) pass strict scrutiny.  Recently, the Supreme Court, in a First Amendment challenge to Florida's judicial conduct rules regarding campaign solicitations, held that the regulation at issue was "one of the rare cases in which a speech restriction withstands strict scrutiny." *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1666 (2015).  On remand, it is for the District Court to ascertain whether the Government has met its burden of showing that the "proposed alternatives will not be as effective as the challenged [Statutes]." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 665 (2004).

## VI.

---

[12] We remand both the as-applied and overbreadth claims, as the level of scrutiny is a key factor in both as-applied and overbreadth challenges.  *Conchatta Inc. v. Miller*, 458 F.3d 258, 267 (3d Cir. 2006); *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 333 (6th Cir. 2009) (en banc).  We also remand for the District Court to determine if Free Speech Coalition and the American Society of Media Photographers have associational standing, as the level of scrutiny is relevant in resolving this issue.  *FSC III*, 787 F.3d at 153-54.

The other recent Supreme Court case that requires us to reconsider our holding in *FSC III* is *City of Los Angeles v. Patel*, 135 S. Ct. 2443 (2015). *Patel* dealt with a city ordinance that created an inspection regime with similarities to the one at issue here. *Compare id.* at 2448 ("Section 41.49(3)(a) . . . states . . . that hotel guest records 'shall be made available to any officer of the Los Angeles Police Department for inspection,' provided that '[w]henever possible, the inspection shall be conducted at a time and in a manner that minimizes any interference with the operation of the business.'" (quoting L.A. Mun. Code § 41.49(3)(a)), *with* 18 U.S.C. § 2257 (providing that the records must be available for inspection "at all reasonable times)," *id.* § 2257A (same), *and* 28 C.F.R. § 75.5(c)(3) ("The inspections shall be conducted so as not to unreasonably disrupt the operations of the establishment.").

The Supreme Court, after noting that "facial challenges under the Fourth Amendment are not categorically barred or especially disfavored," *Patel*, 135 S. Ct. at 2449, struck down the hotel inspection regulation as facially unconstitutional because it did not provide the hotel operators an opportunity for precompliance review by a neutral arbiter, *id.* at 2454. In doing so, the Court rejected the argument that the hotel industry was "closely regulated," such that there was no reasonable expectation of privacy, and held that, even if

34

it was, warrantless searches in this context were unreasonable. *Id.* at 2454-56.

In light of *Patel*, we now turn to Plaintiffs' Fourth Amendment claim that the inspection provisions of the Statutes and § 75.5 are unconstitutional. First, we determine that Plaintiffs have standing. Next, we decide that it is appropriate to consider Plaintiffs' facial challenge to the inspection provisions. Finally, we hold that the inspection regime is unconstitutional because the administrative search exception to the warrant requirement for closely regulated industries is inapplicable. Even if it were applicable, it does not pass muster under the test for reasonableness.

## A.

Before reaching the merits of Plaintiffs' Fourth Amendment claim, we address the Government's justiciability arguments.[13] The Government urges that Plaintiffs lack standing to pursue injunctive relief because they have not demonstrated sufficient threat of

---

[13] The Government has not renewed these arguments on rehearing, as we directed the parties to focus on the applicability of the secondary effects doctrine. Nonetheless, our opinion in *FSC III* has been vacated, and we have an obligation to address our jurisdiction before we can turn to the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95-96 (1998).

injury and their claims of future harm are not redressable through injunctive relief given that no inspection program has been in place since 2008. The Government also points to this lack of an existing inspection regime as proof that Plaintiffs' Fourth Amendment claims are not ripe.

Standing to seek injunctive relief requires a plaintiff to show (1) "that he is under threat of suffering 'injury in fact' that is concrete and particularized"; (2) "the threat must be actual and imminent, not conjectural or hypothetical"; (3) "it must be fairly traceable to the challenged action of the defendant"; and (4) "it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.,* 555 U.S. 488, 493 (2009) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180-81 (2000)). That some of FSC's members have previously undergone searches pursuant to the regulations here is not sufficient on its own to confer standing to seek injunctive relief. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 109 (1998) ("'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'" (omission in original) (quoting *O'Shea v. Littleton,* 414 U.S. 488, 495-96 (1974))); *see also McNair v. Synapse Grp. Inc.,* 672 F.3d 213, 225 (3d Cir. 2012) (holding that past injuries "may suffice to confer

36

individual standing for monetary relief" but "a plaintiff seeking injunctive relief must demonstrate a likelihood of future harm"). Accordingly, we focus on the threat of future harm for purposes of this standing inquiry.

Here, despite the lack of an existing inspection regime to implement § 75.5, Plaintiffs are suffering real costs as a condition of compliance with a regulation that they urge is unconstitutional. Sufficient injury exists to confer standing where "the regulation is directed at [Plaintiffs] in particular; it requires them to make significant changes in their everyday business practices; [and] if they fail to observe the . . . rule they are quite clearly exposed to the imposition of strong sanctions," even where there is no pending prosecution. *Pic–A–State Pa., Inc. v. Reno,* 76 F.3d 1294, 1300 (3d Cir. 1996) (omission in original) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 154 (1967), *abrogated on other grounds by Califano v. Sanders,* 430 U.S. 99, 105 (1977)); *see also Lozano v. City of Hazleton,* 620 F.3d 170, 185 (3d Cir. 2010) (standing existed where plaintiffs were "direct targets of an ordinance they allege to be unconstitutional, complaining of what that ordinance would compel them to do"), *vacated on other grounds,* 131 S. Ct. 2958 (2011). Here, those Plaintiffs who generate images within the reach of the Statutes face criminal prosecution if they do not make their records available for at least twenty hours per week as required by regulation. *See* 18 U.S.C. § 2257(f)(5); *id.* § 2257A(f)(5); 28 C.F.R

37

§ 75.5(c)(1). Even without a formal inspection regime in place, Plaintiffs must still comply with § 75.5's requirements and be prepared to face an inspection without warning and at law enforcement's discretion. Each week, Plaintiffs either personally or through a custodian must arrange their businesses to have access to their records during specific times. The cost of complying with this regulation thus affects each producer of sexually explicit images in a concrete way that is sufficient to establish an injury-in-fact.

Compounding this injury is that the threat of future inspection is not remote, despite the Government's assurances to the contrary. There is no dispute that Plaintiffs intend to continue to engage in conduct that subjects them to enforcement under the Statutes. And nothing prevents law enforcement from resuming inspections pursuant to § 75.5, even if we accept the Government's representation that it has no current plans to do so. Further, although not sufficient on its own to support standing, the fact that some of FSC's members have been subjected to records inspections in the past makes the threat of future inspections more credible. *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2345 (2014) ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" (quoting *Steffel v. Thompson,* 415 U.S. 452, 459 (1974))). Therefore, we conclude that Plaintiffs have also demonstrated that the threat of future harm is

"actual and imminent, not conjectural or hypothetical." *Summers,* 555 U.S. at 493.

Viewed this way, Plaintiffs' injury is also redressable. "[S]tanding requires that there be redressability, which is 'a showing that the injury will be redressed by a favorable decision.'" *Constitution Party of Pa. v. Aichele,* 757 F.3d 347, 368 (3d Cir. 2014) (internal quotation marks omitted) (quoting *Toll Bros. v. Twp. of Readington,* 555 F.3d 131, 142 (3d Cir. 2009)). A declaration that § 75.5 is unconstitutional and an injunction barring the Government from conducting searches in the manner currently prescribed would alleviate the costs associated with making records available for physical inspection twenty hours per week and remove the real threat of inspections described

above.[14]  For these reasons, we hold Plaintiffs' Fourth Amendment claims are justiciable.[15]

---

[14] The Government does not challenge the traceability requirement, and rightfully so.  There can be no doubt that the challenged regulation caused the injury-in-fact of which Plaintiffs complain.  *See Toll Bros. v. Twp. of Readington,* 555 F.3d 131, 142 (3d Cir. 2009) ("If the injury-in-fact prong focuses on *whether* the plaintiff suffered harm, then the traceability prong focuses on *who* inflicted that harm.").

[15] For the same reasons, we hold that Plaintiffs' Fourth Amendment claim is also ripe.  Ripeness is a separate doctrine from standing, but both doctrines originate from the same Article III requirement of a case or controversy.  *Susan B. Anthony List v. Driehaus,* 134 S. Ct. 2334, 2341 n.5 (2014) (citing *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 335 (2006)); *see also Presbytery of N.J. of Orthodox Presbyterian Church v. Florio,* 40 F.3d 1454, 1462 (3d Cir. 1994) (standing concerns "*who* may bring the action" and ripeness involves "*when* a proper party may bring an action" (emphasis added)).  Here, whether Plaintiffs have standing or their claims are ripe for adjudication both turn on whether the threat of future harm under the Statutes is sufficiently immediate to constitute a cognizable injury.  *See Presbytery of N.J.,* 40 F.3d at 1462 ("[I]t is of course true that if no injury has occurred, the plaintiff can be told either that *she* cannot

40

**B.**

In *FSC III*, we addressed only the as-applied constitutionality of the regulations, and we found them to be unconstitutional as-applied to Plaintiffs. However, given the similarity between the inspection provisions of the Statutes and the regulation at issue in *Patel*,[16] we now

---

sue, or that she cannot sue *yet.*" (quoting *Smith v. Wis. Dep't of Agric., Trade & Consumer Prot.,* 23 F.3d 1134, 1141 (7th Cir. 1994))). Here, the threat of future inspections has caused Plaintiffs to incur ongoing costs to comply with the regulations. Under these circumstances, Plaintiffs' claims are ripe.

[16] The inspection provisions of the Statutes, as detailed *supra*, provide that any person to whom the Statutes apply "shall maintain the records required by this section at his business premises, or at such other place as the Attorney General may by regulation prescribe and shall make such records available to the Attorney General for inspection at all reasonable times." 18 U.S.C. § 2257; *id.* § 2257A. In contrast, the applicable provision in *Patel* stated that hotel guest records "'shall be made available to any office of the Los Angeles Police Department for inspection,' provided that '[w]henever possible, the inspection shall be conducted at a time and in a manner that minimizes any interference with the operation of the business.'" *City of Los Angeles v. Patel*, 135 S. Ct. 2443,

hold that the inspection provisions of the Statutes and § 75.5 are facially unconstitutional.

Given this shift in analysis, we first discuss the propriety of considering a facial challenge under the Fourth Amendment, which is "not categorically barred or especially disfavored." *Patel*, 135 S. Ct. at 2449. A facial challenge attacks the statute itself, not a particular application, and thus is rightly "the most difficult . . . to mount successfully." *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). *Patel* directly addressed the validity of a facial challenge under the Fourth Amendment, and noted that "on numerous occasions [we have] declared statutes facially invalid under the Fourth Amendment." *Id.* at 2450 (citing *Chandler v. Miller*, 520 U.S. 305, 308-09 (1987), *Ferguson v. Charleston*, 532 U.S. 67, 86 (2001), *Payton v. New York*, 445 U.S. 573, 574 (1980), and *Torres v. Puerto Rico*, 442 U.S. 465, 466 (1979)).

The Court specifically rejected the argument that "facial challenges to statutes authorizing warrantless

---

2448 (2015) (quoting L.A. Mun. Code § 41.49). The Government, in its motion opposing re-hearing, does not seriously contest the applicability of *Patel* to this case. Instead, it claims that it is modifying the regulations to comply with our decision in *FSC III* and with *Patel*.

42

searches must fail because such searches will never be unconstitutional in all applications." *Id.* This argument failed because, under the Fourth Amendment, "the proper focus of the constitutional inquiry is searches that the law actually authorizes, not for those for which it is irrelevant." *Id.* at 2451. Thus, searches conducted under an exception to the warrant requirement, or pursuant to a warrant itself, would obviously not be unconstitutional in their application, and thus are irrelevant to our analysis of a statute's facial validity "because they do not involve actual applications of the statute." *Id.* As the Supreme Court did in *Patel*, we will now consider Plaintiffs' facial challenge to this inspection regime.

## C.

In *FSC I,* we directed the District Court to consider whether an inspection done in accordance with the Statutes and § 75.5 "was a 'search' under the Fourth Amendment pursuant to either the reasonable-expectation-of-privacy test set forth in [*Katz v. United States,* 389 U.S. 347 (1967)] or the common-law-trespass test described in [*United States v. Jones,* 132 S. Ct. 945 (2012)]." 677 F.3d at 544. After developing a thorough record, the District Court concluded that the warrantless inspections conducted pursuant to regulation were searches under both tests. As to the *Katz* analysis, the District Court held that the inspections invaded areas to which the public did not have access and in which there was a reasonable expectation of privacy (*e.g.*, private

43

offices, storage rooms, and residences). *FSC II,* 957 F. Supp. 2d at 602-03. And the physical presence of law enforcement officers in those areas also constituted trespasses under the *Jones* framework. *Id.* at 603-04. The Government does not contest this analysis, and we see no reason to reach a different conclusion, especially after *Patel*.

In *Patel*, the Court described two different types of administrative searches. Recognizing that a warrantless administrative search provision would normally be facially unconstitutional if there was no "opportunity for precompliance review," 135 S. Ct. at 2451, it also noted that if the establishment was part of a "closely regulated" industry, the ordinance could be "facially valid under the more relaxed standard that applies to searches of this category of businesses, *id.* at 2454. In this case, the constitutionality of the warrantless searches under the Fourth Amendment rises and falls with the administrative search exception to the warrant requirement applicable to closely regulated industries. "Searches conducted absent a warrant are *per se* unreasonable under the Fourth Amendment, subject to certain exceptions." *United States v. Katzin,* 769 F.3d 163, 169 (3d Cir. 2014) (en banc). "[T]he few situations in which a search may be conducted in the absence of a warrant have been carefully delineated and the burden is on those seeking the exemption to show the need for it." *California v.*

44

*Acevedo,* 500 U.S. 565, 589 n.5 (1991) (quoting *United States v. Jeffers*, 342 U.S. 48, 51 (1951)).

As we explained in *FSC I,* "[c]ertain industries have such a history of government oversight that no reasonable expectation of privacy could exist."  677 F.3d at 544.  Under these circumstances, "the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search, have lessened application."  *New York v. Burger,* 482 U.S. 691, 702 (1987) (citation omitted).  Thus, "where the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment."  *Id.*  Even if a business is part of a closely regulated industry, we must consider whether the warrantless searches themselves are reasonable.  This requires examining whether "the following criteria are met: (1) the regulatory scheme furthers a substantial government interest; (2) the warrantless inspections are necessary to further the regulatory scheme; and (3) the inspection program, in terms of certainty and regularity of its application, is a constitutionally adequate substitute for a warrant."  *FSC I,* 677 F.3d at 544 (citing *Burger,* 482 U.S. at 702-03).

**1.**

To determine whether an industry is closely regulated, factors to consider include the "duration of the regulation's existence, pervasiveness of the regulatory scheme, and regularity of the regulation's application." *Id.* Here, the Government points to the fact that since 1978, Congress has criminalized the commercial use of children in sexually explicit materials. *See id.* at 525. Since 1988, Congress has imposed recordkeeping requirements similar to those currently embodied in § 2257. *Id.* Some regulation of sexually explicit images, even those not depicting children, has therefore been in place for some time.

But the regulations in this area are not as pervasive as in other industries previously deemed closely regulated. For example, in determining whether the Pennsylvania funeral industry was closely regulated, we looked to the "broad range of standards that funeral directors in Pennsylvania have long been required to comply with," including licensing requirements, health standards, funeral home services requirements, federal pricing disclosure requirements, and OSHA safety standards. *Heffner v. Murphy*, 745 F.3d 56, 66 (3d Cir. 2014). Similarly, in finding the New Jersey horseracing industry closely regulated, we looked to the industry's licensing requirements for all employees in the industry, prohibitions on employing individuals convicted of certain crimes, and the creation of the New Jersey Racing

46

Commission with broad rulemaking authority. *Shoemaker v. Handel*, 795 F.2d 1136, 1141 (3d Cir. 1986).

In addition, the Supreme Court in *Patel* noted that in the forty-five years since the administrative search doctrine was created, it "has identified only four industries that 'have such a history of government oversight that no reasonable expectation of privacy . . . could exist for a proprietor over the stock of such an enterprise.'" 135 S. Ct. at 2454 (quoting *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978)). This doctrine is thus "the exception," not the rule. *Barlow's*, 436 U.S. at 313. The pornography industry, like the hotel industry in *Patel*, is not subjected to a level of regulation even approximating the pervasive regulation aimed at the liquor industry, *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 (1970), firearms dealing, *United States v. Biswell*, 406 U.S. 311, 311-12 (1972), mining, *Donovan v. Dewey*, 452 U.S. 594 (1981), or independent automobile junkyards, *New York v. Burger*, 482 U.S. 691 (1987). In *Burger*, for example, these regulations were backed by civil and criminal penalties, and some form of regulation had existed for at least 140 years. *Id.* at 704, 707.

In contrast with the above-mentioned industries, the Government fails to identify any similar requirements for producers of sexually explicit images. Nor are the regulations that the Government does identify sufficient.

47

First, the prohibition of child pornography is a broad proscription of a class of images and does not directly target the industry in which Plaintiffs are engaged. Nor could it; Plaintiffs' expression is constitutionally protected, while child pornography is not. *See Ferber*, 458 U.S. at 764. Indeed, enforcement of the ban is not limited to only those engaged in the business of producing sexually explicit images. The ban on child pornography is therefore more appropriately considered a generally applicable criminal law, not the targeted regulation of a legitimate industry. Although the nature of Plaintiffs' businesses enhances the chance that they might run afoul of these laws, that alone does not justify deeming the entire industry closely regulated.

Second, the other provisions of the Statutes do not justify classifying producers of adult images as closely regulated. To be sure, the Statutes require recordkeeping and labeling. Yet no one is required to obtain a license or register with the Government before producing a sexually explicit image. An artist can pick up a camera and create an image subject to the Statutes without the knowledge of any third party, much less the Government. Nor has the Government identified any regulations governing the manner in which individuals and businesses must produce sexually explicit images. The creation of sexually explicit expression is better characterized by its lack of regulation than by a regime of rules governing such expression.

48

Third, the Government also cannot rely on the inspection provisions of the Statutes and regulations to themselves establish that the industry is closely regulated. The creation of sexually explicit images is not a "new or emerging industr[y]" to which the Government must respond to ensure public health and safety. *See Donovan*, 452 U.S. at 606 (noting that some new industries, at the time including the nuclear power industry, can be subject to warrantless searches despite "the recent vintage of regulation"). We are doubtful that the Government can create the reduced expectation of privacy of a closely regulated industry to justify warrantless inspections by simply mandating those inspections, particularly where that industry existed long before the regulation's enactment. *See Patel*, 135 S. Ct. at 2455 ("The City wisely refrains from arguing that [the challenged inspection provision] itself renders hotels closely regulated."); *Burger*, 482 U.S. at 720 (Brennan, J., dissenting) ("[T]he inspections themselves cannot be cited as proof of pervasive regulation justifying elimination of the warrant requirement; that would be obvious bootstrapping."). And in any event, as the Government readily acknowledges, no inspections have taken place since 2007. This is hardly the "regularity of the regulation's application," *FSC I*, 677 F.3d at 544, that we would expect of a closely regulated industry. For these reasons, we conclude that producers of sexually explicit images are not currently part of a closely

regulated industry, and this exception to the warrant requirement does not apply.

**2.**

This alone is sufficient to conclude that the warrantless searches authorized by this regime violate the Fourth Amendment. In the interest of completeness, however, we also address why those inspections are unreasonable, even if producers of sexually explicit images were closely regulated. For this inquiry, we consider whether "(1) the regulatory scheme furthers a substantial government interest; (2) the warrantless inspections are necessary to further the regulatory scheme; and (3) the inspection program, in terms of certainty and regularity of its application, is a constitutionally adequate substitute for a warrant." *FSC I*, 677 F.3d at 544 (citing *Burger*, 482 U.S. at 702-03). Having already discussed the substantiality of the Government's interest in protecting children with this regulatory scheme, *id.* at 535, we need not dwell on that criterion of this test. And because we find the warrantless inspections here unnecessary, we need not reach whether the inspection program is "a constitutionally adequate substitute for a warrant."[17]

---

[17] The District Court considered these three criteria as factors, as opposed to independent requirements. *Free Speech Coal., Inc. v. Holder*, *FSC II*, 957 F. Supp. 2d

50

Warrantless inspections are necessary where a warrant would undercut the regulatory scheme. But the Government "need not show that warrantless searches are the *most* necessary way to advance its regulatory interest." *Heffner*, 745 F.3d at 68. The need for warrantless searches is most clear where the "administrative inspection scheme[] . . . depend[s] on the element of surprise to both detect and deter violations." *Id.* Thus, in *Donovan*, warrantless inspections to ensure mine safety were necessary because "a warrant requirement could significantly frustrate effective enforcement of the Act" given "the notorious ease with which many safety or health hazards may be concealed if advance warning of inspection is obtained." 452 U.S. at 603. Similarly, inspections of firearms dealers and

---

564, 605 (E.D. Pa. 2013) (describing "three-factor" *Burger* test"). This was error. As the Supreme Court explained, "[a] warrantless inspection, . . . even in the context of a pervasively regulated business, will be deemed to be reasonable *only* so long as [these] three criteria are met." *New York v. Burger*, 482 U.S. 691, 702 (1987); *Patel*, 135 S. Ct. at 2456 ("Even if we were to find that hotels are pervasively regulated, [the ordinance] would need to satisfy three additional criteria to be reasonable."). In other words, even if an inspection program is an adequate replacement for a warrant, the Government must still demonstrate that warrantless inspections are necessary in the first instance.

51

junkyards require unannounced, warrantless inspections in order to prevent the disposal of illicitly held items. *Burger*, 482 U.S. at 710 (citing *United States v. Biswell*, 406 U.S. 311, 315 (1972)). By contrast, where inspections target conditions that are "relatively difficult to conceal or to correct in a short time," warrants may be required. *Biswell*, 406 U.S. at 316 (citing *See v. City of Seattle*, 387 U.S. 541 (1967)).

Here, the Government has all but admitted that warrantless searches are unnecessary. As the District Court found, "[b]oth FBI agents testified that it was highly unlikely that a producer could assemble Section 2257 records" on short notice. *FSC II*, 957 F. Supp. 2d at 606. And we agree with law enforcement's testimony that the destruction of evidence is not a real concern, given that to do so would only compound any criminal violation of the Statutes. Further, law enforcement here conducted nearly one third of its inspections under the Statutes after providing notice and without any reports of fabrication. Thus, the record establishes that the type of records required to be maintained, given their scope as well as the need for indexing and cross-referencing, could not easily be recreated on short notice nor could violations be concealed. Under these circumstances, "inspection warrants could be required and privacy given a measure of protection with little if any threat to the effectiveness of the inspection system." *Biswell*, 406 U.S. at 316.

52

Administrative warrants[18] provide "assurances from a neutral officer that the inspection is reasonable under the Constitution, is authorized by statute, and is pursuant to an administrative plan containing specific neutral criteria." *Marshall*, 436 U.S. at 323; *see also Martin v. Int'l Matex Tank Terminals-Bayonne*, 928 F.2d 614, 621 (3d Cir. 1991). These safeguards may only be abandoned if necessary, and, as the Government has conceded, their abandonment is not necessary here.[19]

---

[18] There is a difference between searches for which no warrant is required, administrative searches that require an administrative search warrant, and ordinary searches that require a warrant based upon "probable cause in the criminal law sense." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320 (1978). In this case, the Government maintains the closely regulated industry exception applies and, accordingly, warrantless searches are permissible. We disagree. We need not further decide whether administrative search warrants would suffice to cure the Fourth Amendment problem in this case, or whether warrants based on probable cause in the criminal law sense would be required. *See Martin v. Int'l Matex Tank Terminals-Bayonne*, 928 F.2d 614, 621 (3d Cir. 1991) (discussing the difference between the two).

[19] We also note that in *Patel*, the Supreme Court rejected the argument that affording "any opportunity for precompliance review would fatally undermine the scheme's efficacy by giving operators a chance to falsify

Even if the administrative search exception to the warrant requirement for closely regulated industries were applicable in this case, this inspection regime is unreasonable. Thus, the inspection regime prescribed by the Statutes and § 75.5[20] is facially unconstitutional.

---

records," an argument that "could be made regarding any recordkeeping requirement." 135 S. Ct. at 2455. If a fear of falsification were present, nothing could stop an FBI agent from obtaining an *ex parte* warrant or from guarding the records pending a hearing on a motion to quash. *Id.*

[20] While we hold that the inspection regime is facially unconstitutional under the Fourth Amendment, we also consider dubious § 75.5's requirement that producers make their records available for at least twenty hours per week during pre-established periods. 28 U.S.C. § 75.5(c)(1). In *FSC III* we questioned whether this requirement was sufficiently narrowly tailored to survive intermediate scrutiny under the First Amendment. Given our holding that the Statutes (and their implementing regulations) are now subject to strict scrutiny, the constitutionality of this provision under the First Amendment is further in doubt. Because we hold that § 75.5 is facially unconstitutional under the Fourth Amendment, we see no need to reach this question.

## VIII.

For the reasons stated above, we will vacate the District Court's denial of Plaintiffs' First Amendment claims. We will remand to the District Court for further consideration of whether the Statutes are narrowly tailored such that they survive strict scrutiny. We will also vacate the portion of the District Court's judgment denying Plaintiffs' Fourth Amendment claim, and we will remand to the District Court to enter a judgment declaring that the warrantless searches authorized by the Statutes and § 75.5 are facially unconstitutional under the Fourth Amendment.[21]

---

[21] Plaintiffs also renew their request for a permanent injunction. The District Court's denial of a permanent injunction is reviewed for abuse of discretion. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Relying on the Government's 2008 disbandment of its inspection program, the District Court held that "Plaintiffs d[id] not face a realistic threat of 'irreparable harm.'" *FSC II*, 957 F. Supp. 2d at 609. We note that the existence vel non of a threat of irreparable harm is a different inquiry from whether Plaintiffs have demonstrated injury-in-fact sufficient to support standing, as discussed *supra*. Because we do not perceive any abuse of discretion and Plaintiffs fail to argue otherwise, we decline to issue a permanent injunction.

*Free Speech Coalition, Inc., et al. v. Attorney General*

No. 13-3681

**RENDELL**, Circuit Judge, dissenting:

We face a conundrum in this case in that we have two diametrically opposed Supreme Court precedents regarding the level of scrutiny to be applied. While reasonable minds definitely do disagree on this issue, I must respectfully dissent from the majority's conclusion that *Reed v. Town of Gilbert, Arizona*, 135 S. Ct. 2218 (2015), controls this case rather than the Supreme Court's jurisprudence establishing the secondary effects doctrine. In declining to apply the doctrine here, the majority reasons that "any application of [it] beyond what the Supreme Court has explicitly endorsed would bring this case into direct conflict with *Reed's* pronouncement that we cannot look behind a facially content-based law to a benign motive in order to shield the law from the rigors of strict scrutiny." Maj. Op. 29. It therefore sends 18 U.S.C. §§ 2257 and 2257A to face strict scrutiny, likely dooming these laws that were enacted to reduce the criminal harm to minors that flows from child pornography. But rather than take this drastic step, I am of the view that we should apply the secondary effects doctrine—which has direct application here—and save these laws from unconstitutionality. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2594 (2012) ("[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality." (citation and internal quotation marks omitted)).[1]

---

[1] In *Free Speech III*, although we applied intermediate scrutiny and upheld §§ 2257 and 2257A as constitutional

The secondary effects doctrine has long served as an exception to the rule that facially content-based laws must undergo strict scrutiny. *See, e.g.*, *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–49 (1986) (applying doctrine and concluding that a law was content neutral even though on its face it "treat[ed] theaters that specialize in adult films differently from other kinds of theaters").[2] Under the doctrine, a facially content-based law will nonetheless be deemed content neutral and thus subject to intermediate scrutiny if it was enacted not to suppress protected speech but to reduce harmful secondary effects—such as crime—that are uniquely caused by or associated with the protected speech that is singled out by the law. *Id.* at 48; *see also* Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. Chi. L. Rev. 413, 483 (1996) ("The essence of the secondary effects doctrine runs as follows: facially content-based regulations of speech that 'are justified without reference to the content of the regulated speech' should be treated as if they made no facial distinctions on the basis of content." (citations omitted)).

---

under the First Amendment, "we noted that the Statutes may not have been able to survive strict scrutiny." Maj. Op. 16 (citing *Free Speech Coal. Inc. v. Att'y Gen. (FSC III)*, 787 F.3d 142, 156 (3d Cir. 2015), *vacated and reh'g granted*, 2015 U.S. App. LEXIS 15448 (3d Cir. Sept. 01, 2015)); *see also Burson v. Freeman*, 504 U.S. 191, 211 (1992) ("[I]t is the rare case in which . . . a law survives strict scrutiny.").

[2] *But see City of Erie v. Pap's A.M.*, 529 U.S. 277, 291–96 (2000) (plurality opinion) (relying on the secondary effects doctrine to uphold a facially neutral law).

In 2015, however, the Supreme Court complicated matters when it issued its opinion in *Reed v. Town of Gilbert*, a case involving a local sign ordinance that the Court held to be content based on its face. In reversing the Ninth Circuit and striking down the ordinance, the Court stressed that "the crucial first step in the content-neutrality analysis" is "determining whether the law is content neutral on its face." 135 S. Ct. at 2228. Then, seemingly departing from prior precedent, it stated that "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* (citation omitted); *see also id.* ("In other words, an innocuous justification cannot transform a facially content-based law into one that is content neutral.").

The secondary effects doctrine thus seems logically irreconcilable with *Reed*. The doctrine constitutes an exception to the rule that facially content-based laws must undergo strict scrutiny. But we are left wondering whether *Reed* has eliminated this exception with its sweeping rule that facially content-based laws are subject to strict scrutiny regardless of the government's motives for enacting the law. It would appear so.[3]

Yet we cannot conclude that the secondary effects doctrine no longer applies, because the Court in *Reed* never

---

[3] An argument could be made, however, that *Reed* is not as broad as it seems, as the Court neither addressed the secondary effects doctrine nor unequivocally ruled out the possibility that strict scrutiny might not apply to a different facially content-based law.

addressed or even mentioned it—let alone overruled *Renton* or any of the other secondary effects precedent. The Court has admonished that other courts cannot conclude that "[its] more recent cases have, by implication, overruled an earlier precedent." *Agostini v. Felton*, 521 U.S. 203, 237 (1997); *see also Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.").[4]

We must therefore decide how to resolve this conflict between Supreme Court precedent applying the secondary effects doctrine and *Reed*'s sweeping rule that facially content-based laws must undergo strict scrutiny. Fortunately, the Supreme Court has given us guidance as to how to do so: it has instructed that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). The issue, then, is whether the secondary effects doctrine—which seems to rest on reasons rejected by the Court in *Reed*—has "direct application" in this case. Or, does *Reed*'s sweeping rule have "direct application" here such that §§ 2257 and 2257A must undergo strict scrutiny?

In my view, the secondary effects doctrine has direct application here. The Court over the years has applied the secondary effects analysis to laws involving a diverse range

---

[4] Indeed, other courts have reasoned that *Reed*'s failure to mention certain precedent calling for intermediate scrutiny means that that precedent survives *Reed*. *See infra* note 7.

4

of subject matter.[5] But it has actually found such effects almost exclusively in the context of facially content-based laws that affect sexually explicit speech. *See, e.g.*, *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 429–31 (2002) (ordinance prohibiting no more than one "adult entertainment business" in same building that was enacted to reduce crime in areas with these businesses); *Renton*, 475 U.S. at 47–48 (ordinance restricting the location of adult movie theaters that was enacted to reduce crime and blight in areas with these theaters); *Young* v. *Am. Mini Theatres*, 427 U.S. 50, 52–55 (1976) (plurality opinion) (same).[6] Indeed, the Court created the doctrine based on the premise that sexually explicit

---

[5] *See, e.g.*, *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 430 (1993) (commercial speech); *Boos v. Berry*, 485 U.S. 312, 320–21 (1988) (political speech).

[6] The majority contends that the Court has actually found such effects only in the narrow context of "regulations affecting physical purveyors of adult sexually explicit content." Maj. Op. 24. But the plurality in *Pap's* rejected this myopic view of the doctrine. *See Pap's*, 529 U.S. at 295 ("Justice Stevens claims [in his dissent] that today we '[f]or the first time' extend *Renton*'s secondary effects doctrine to justify restrictions other than the location of a commercial enterprise. Our reliance on *Renton* to justify other restrictions is not new, however. In *Ward*, the Court relied on *Renton* to evaluate restrictions on sound amplification at an outdoor bandshell, rejecting the dissent's contention that *Renton* was inapplicable."); *see also McCullen v. Coakley*, 134 S. Ct. 2518, 2531–32 (2014) (relying on *Renton* in concluding that abortion-clinic buffer-zone law was content neutral"); *id.* at 2543–44 (Scalia, J., dissenting) (criticizing the majority's reliance on *Renton*).

speech by its very nature can cause or correlate with societal harms such as crime and blight in a way that other kinds of protected speech typically cannot. *See Am. Mini Theatres*, 427 U.S. at 71 n.34 (agreeing that "a concentration of 'adult' movie theaters causes the area to deteriorate and become a focus of crime, effects which are not attributable to theaters showing other types of films").

Furthermore, the Court has repeatedly articulated a related, but even more fundamental, reason as to why the doctrine and intermediate scrutiny should apply to laws affecting sexually explicit speech: this kind of speech, though protected, categorically deserves less protection than others kinds of protected speech. That is because, simply put, sexually explicit speech is not as vital to our society as other kinds of protected speech. *See id.* at 70 ("[E]ven though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate . . . .[and that] few of us would march our sons and daughters off to war to preserve the citizen's right to see [sexually explicit speech]."); *Pap's*, 529 U.S. at 294 (relying on this language); *Renton*, 475 U.S. at 49 n.2. Thus, the plurality in *American Mini Theatres*—the case in which the secondary effects doctrine was first recognized—concluded that "[e]ven though the First Amendment protects communications in this area from total suppression, . . . the State may legitimately use the content of these materials as the basis for placing them in

6

a different classification" from other materials. 427 U.S. at 70–71.[7]

To be sure, the Court has not blindly concluded that any law that affects sexually explicit speech would qualify as

[7] The Court also established years ago that the Constitution "accords a lesser protection" to another distinct form of speech—commercial speech—and has therefore applied intermediate scrutiny to laws affecting this speech. *See Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562–66 (1980). Notably, because the Court in *Reed* never even mentioned *Central Hudson*, at least two district courts in California have concluded that *Reed* does not compel strict scrutiny for laws affecting commercial speech. *See CTIA-The Wireless Assoc. v. City of Berkeley, Cal.*, No. C-15-2529, 2015 WL 5569072, at *10 (N.D. Cal. Sept. 21, 2015) ("The Supreme Court has clearly made a distinction between commercial speech and noncommercial speech, *see, e.g.*, *Central Hudson* . . ., and nothing in its recent opinions, including *Reed*, even comes close to suggesting that that well-established distinction is no longer valid."); *Cal. Outdoor Equity Partners v. City of Corona*, No. CV 15-03172, 2015 WL 4163346, at *10 (N.D. Cal. July 9, 2015) ("*Reed* does not concern commercial speech, let alone bans on off-site billboards. The fact that *Reed* has no bearing on this case is abundantly clear from the fact that *Reed* does not even cite *Central Hudson*, let alone apply it."); *see also Citizens for Free Speech, LLC v. Cty. of Alameda*, 114 F. Supp. 3d 952, 968–69 (N.D. Cal. 2015) (rejecting plaintiffs' argument that *Reed* governed a regulation that banned commercial speech and applying intermediate scrutiny to that regulation).

having been enacted to combat secondary effects of the protected speech. In *Reno v. ACLU*, for example, the Court held that the government could not rely on the doctrine because the law at issue sought to alleviate not secondary but "primary effects" of sexually explicit speech, which it defined as "'the direct impact of [the] speech on its audience.'" 521 U.S. 844, 868 (2000) (quoting *Boos*, 485 U.S. at 321)). The law was the federal Communications Decency Act, which criminalized "the knowing transmission of obscene or indecent messages to any recipient under 18 years of age," as well as the "knowing sending or displaying of patently offensive messages in a manner that is available to a person under 18 years of age." *Id.* at 859. The Court rejected the government's secondary effects argument, concluding that "the purpose of the CDA is to protect children from the primary effects of 'indecent' and 'patently offensive' speech, rather than any 'secondary' effect of such speech." *Id.* at 868; *see also United States v. Playboy Entm't Grp. Inc.*, 529 U.S. 803, 815 (2000) (determining that doctrine did not save a federal law from strict scrutiny that restricted cable pornography because its objective was to shield children from "the primary effects of [the] protected speech").

Given these parameters of the doctrine, I suggest that it has "direct application" in this case, although it "appears to rest on reasons rejected in [*Reed*]." *Rodriguez de Quijas*, 490 U.S. at 484. Sections 2257 and 2257A are facially content-based laws because they impose restrictions based on the content of the speech, i.e., they apply only to depictions of "actual sexually explicit conduct" and "simulated sexually explicit conduct." But the reason for the restrictions is based on a secondary effect of this protected speech, namely the criminal harm to children that flows from child pornography,

8

a harm that is uniquely attributable, at least in some cases, to this speech. *See* Maj. Op. 5–6 (Congress enacted these laws because, despite the criminalization of child pornography, "producers of sexually explicit materials continued to utilize youthful-looking performers. Law enforcement was viewed as ill-equipped to visually determine these performers' ages, and, as a consequence, the risk that children were still being used in pornographic materials remained."). And "it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in" protecting other kinds of speech. *Am. Mini Theatres*, 427 U.S. at 70; *see also id.* at 70–71 ("Even though the First Amendment protects communications in this area from total suppression, we hold that the State may legitimately use the content of these materials as the basis for placing them in a different classification [from other materials]."). Finally, §§ 2257 and 2257A were not enacted by Congress to mitigate any "primary effects" of this protected but low-value speech. *See Free Speech Coal., Inc. v. Att'y Gen.*, 677 F.3d 519, 534 (3d Cir. 2012) (stating that Congress did *not* target the speech affected by these laws because of its "effect on audiences or any disagreement with [its] underlying message").

Rather than hold that §§ 2257 and 2257A are subject to strict scrutiny in light of *Reed*, I would affirm the District Court's determination that these laws are subject to intermediate scrutiny, but remand for it to apply the burden-shifting framework applicable to secondary effects cases as set forth by the Supreme Court in *Alameda Books*.[8] Thus, I

---

[8] *See* 535 U.S. at 426 ("The [government's] evidence must fairly support [its] rationale for its ordinance. If

9

respectfully dissent from this portion of the majority's opinion.

plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the [government's] evidence does not support its rationale or by furnishing evidence that disputes the [government's] factual findings, the [government] meets the standard set forth in *Renton*. If plaintiffs succeed in casting doubt on a [government's] rationale in either manner, the burden shifts back to the [government] to supplement the record with evidence renewing support for a theory that justifies its ordinance.").