**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 18-3188 & 18-3189
_____

FREE SPEECH COALITION, INC.; AMERICAN SOCIETY
OF MEDIA PHOTOGRAPHERS, INC.; THOMAS HYMES;
TOWNSEND ENTERPRISES, INC., DBA Sinclair Institute;
BARBARA ALPER; CAROL QUEEN; BARBARA NITKE;
DAVID STEINBERG; MARIE L. LEVINE, a/k/a Nina
Hartley; DAVE LEVINGSTON; BETTY DODSON;
CARLIN ROSS,
　　　　　　　　Appellants in No. 18-3189

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,
　　　　　　　　Appellant in No. 18-3188
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2-09-cv-04607)
District Judge:　Honorable Michael M. Baylson
_____

Argued September 12, 2019

Before:  CHAGARES, JORDAN, and RESTREPO, <u>Circuit Judges</u>

(Opinion Filed:  September 1, 2020)
_____

Scott R. McIntosh
United States Department of Justice
Civil Division, Room 7259
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Anne Murphy [ARGUED]
United States Department of Justice
Appellate Section, Room 7644
950 Pennsylvania Avenue, N.W.
Washington, DC 20004
	*Counsel for Appellant in No. 18-3188*

Lorraine R. Baumgardner
J. Michael Murray [ARGUED]
Berkman Gordon Murray & DeVan
55 Public Square, Suite 2200
Cleveland, OH 44113
	*Counsel for Appellants in No. 18-3189*

_____

OPINION OF THE COURT
_____

CHAGARES, Circuit Judge.

Producers of pornography oftentimes depict young-looking performers who appear as if they could be children but might, in fact, be adults. In that circumstance, producers and law enforcement alike cannot know, absent proof of performers' ages, whether these sexually explicit scenes involve children and violate laws prohibiting the production of child pornography. To combat that problem and protect children from sexual exploitation, Congress enacted 18 U.S.C. §§ 2257 and 2257A (collectively, "the Statutes"). The Statutes require producers of pornography to verify the age and identity of each person portrayed, to keep records of the age verification, and to label each depiction with the location where law enforcement may obtain those records. In this cross-appeal, we consider First Amendment challenges brought by twelve plaintiffs, including two associations, involved in the production of pornography covered by the Statutes. The plaintiffs claim that the age verification, recordkeeping, and labeling requirements, the implementing regulations for those requirements, and the Statutes' criminal penalties for noncompliance unnecessarily restrict their freedom of speech. They therefore assert that those provisions violate the First Amendment as applied to them and are facially invalid under the First Amendment overbreadth doctrine.

This lawsuit, filed in 2009, has been litigated over the course of a decade, and we laud the District Court for its skillful handling of this complex case throughout. The First Amendment challenges have resulted in three prior opinions from this Court. See Free Speech Coal., Inc. v. Att'y Gen. ("FSC I"), 677 F.3d 519 (3d Cir. 2012); Free Speech Coal., Inc. v. Att'y Gen. ("FSC II"), 787 F.3d 142 (3d Cir. 2015); Free

3

Speech Coal., Inc. v. Att'y Gen. ("FSC III"), 825 F.3d 149 (3d Cir. 2016).  In the latest of those decisions, we remanded for the District Court to evaluate the plaintiffs' First Amendment claims under strict scrutiny.  The District Court, on the parties' cross-motions for entry of judgment, then ruled that (1) the two association plaintiffs lack standing to bring as-applied First Amendment challenges; (2) the remaining ten plaintiffs' First Amendment as-applied challenges are meritorious, but only with respect to certain categories of claimants, and the Statutes' criminal penalties for the unconstitutional provisions cannot be enforced; (3) the plaintiffs failed to prove their facial overbreadth claim; and (4) as a remedy for the successful as-applied claims, the plaintiffs are entitled to a so-called nationwide injunction.

Applying strict scrutiny, we agree with the District Court in part.  First, the District Court correctly held that the two association plaintiffs lack standing to bring as-applied First Amendment claims on behalf of their members.  Second, we will affirm in part and reverse in part the District Court's ruling on the remaining ten plaintiffs' as-applied claims.  We conclude that the age verification, recordkeeping, and labeling requirements all violate the First Amendment as applied to those plaintiffs.  The Government conceded that the Statutes' requirements need not apply when sexually explicit depictions show performers who are at least thirty years old because at that age, an adult performer could not reasonably appear to be a child.  So for these plaintiffs — who must comply even for their performers who are at least thirty years old — the requirements are not the least restrictive way to protect children.  As a result, the Statutes' criminal penalties for noncompliance with those requirements cannot be enforced against the successful as-applied plaintiffs.  Third, we hold, as

4

the District Court did, that the age verification, recordkeeping, and labeling requirements are not facially invalid under the First Amendment overbreadth doctrine because the plaintiffs failed to prove that those provisions improperly restrict a substantial amount of protected speech relative to the Statutes' plainly legitimate sweep. Fourth, the District Court erred in entering what the Government labels a nationwide injunction because that remedy was broader than necessary to provide full relief to those plaintiffs who prevailed on their as-applied claims. Given these holdings, we will affirm in part, reverse in part, vacate in part, and remand for the District Court to afford relief consistent with this opinion and limited to those plaintiffs who brought meritorious as-applied claims.

## I.   BACKGROUND

### A.   The Statutes and Their Implementing Regulations

Congress has criminalized the production of commercial child pornography since 1978 and noncommercial child pornography since 1984. See FSC I, 677 F.3d at 525 (describing Congress's efforts to curtail child pornography). In 1986, the Attorney General's Commission on Pornography issued a final report, finding that despite Congress's efforts to criminalize the production of child pornography, producers of sexually explicit depictions generally sought out young-looking performers. Id. at 525–26 (citing Attorney General's Commission on Pornography, Final Report ("Report") 618 (1986)). The use of young-looking performers "made it increasingly difficult for law enforcement officers to ascertain" whether these performers were children or young-looking adults, id. at 526 (quoting Report at 618), and it was "nearly impossible . . . to effectively investigate potential child

5

pornography," id. at 535 (citing Report at 618).  The Report therefore concluded that although child pornography legislation had "drastically curtailed [child pornography's] public presence," id. at 525 (alteration in original) (quoting Report at 608), that legislation "did not end the problem," id.; "an extensive interstate market for child pornography continued to exist," id. at 535 (citing Report at 608–09); and "no evidence . . . suggest[ed] that children [were] any less at risk than before," id. (alterations in original) (quoting Report at 609).

In response to the Report, Congress enacted 18 U.S.C. § 2257 as part of the Child Protection and Obscenity Enforcement Act of 1988, Pub. L. No. 100–690, § 7513, 102 Stat. 4181, 4487.  FSC III, 825 F.3d at 154.  Section 2257 imposes various requirements on those who produce visual depictions of "actual sexually explicit conduct," mandating that these producers collect information to demonstrate that the individuals depicted are not children.  18 U.S.C. § 2257(a)–(b).  Later, Congress enacted 18 U.S.C. § 2257A as part of the Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109–248, § 503, 120 Stat. 587, 626–29, to place similar requirements on producers of depictions of "simulated sexually explicit conduct," 18 U.S.C. § 2257A(a).[1]

---

[1]     For both § 2257 and § 2257A, "sexually explicit conduct" means "(i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the anus, genitals, or pubic area of any person."  18 U.S.C. § 2256(2)(A); see also 28 C.F.R. § 75.1(n)

6

Three of these Statutes' requirements are at issue.  First, a producer must examine "an identification document" for every performer portrayed to ascertain each performer's name and date of birth, and must ascertain any other name that the performer has previously used.  Id. §§ 2257(b)(1)–(2), 2257A(b)(1)–(2).  Second, the producer must "create and maintain individually identifiable records" of that information.  Id. § 2257(a), (b)(3); id. § 2257A(a), (b)(3).  Third, the producer must label "every copy" of the depiction by affixing "a statement describing where the records required . . . may be located," in the "manner and . . . form" prescribed by regulation.  Id. §§ 2257(e)(1), 2257A(e)(1).  The United States Department of Justice has promulgated implementing regulations, 28 C.F.R. § 75.1 et seq., that further refine the Statutes' requirements, see id. §§ 75.2–75.4 (recordkeeping requirement); id. §§ 75.6, 75.8 (labeling requirement).

The age verification, recordkeeping, and labeling requirements apply to both "primary" and "secondary" producers.  See id. § 75.1(c) (defining the word "[p]roducer" in the Statutes).  A primary producer is "any person who actually films, videotapes, photographs, or creates a . . . visual depiction of an actual human being engaged in actual or simulated sexually explicit conduct."  Id. § 75.1(c)(1).  A secondary producer, by contrast, is "any person who," for such a visual depiction, (a) "produces, assembles, manufactures,

_____

(providing that "[s]exually explicit conduct has the meaning set forth in" § 2256(2)(A)).  Performers engage in "[s]imulated sexually explicit conduct" if a "reasonable viewer" would "believe that the performers engaged in actual sexually explicit conduct, even if they did not in fact do so."  28 C.F.R. § 75.1(o).

publishes, duplicates, reproduces, or reissues" the depiction for "commercial distribution"; (b) "inserts on a computer site or service a digital image of" the visual depiction, or "otherwise manages the sexually explicit content of a computer site or service that contains" it; or (c) "enters into a contract, agreement, or conspiracy to do any of the foregoing." Id. § 75.1(c)(2).[2] A secondary producer may satisfy the Statutes' requirement to "create and maintain records" by "accepting . . . copies of the records" created and maintained by the primary producer of that depiction, and by keeping records of the "name and address of the primary producer from whom he received copies of the records." Id. § 75.2(b). "The same person may be both a primary and a secondary producer." Id. § 75.1(c)(3).

The Statutes criminalize the failure to comply with their requirements. 18 U.S.C. §§ 2257(f), 2257A(f). A first-time violator of § 2257 is subject to a five-year maximum term of imprisonment. Id. § 2257(i). Subsequent violations are punishable by a term of imprisonment of at least two years and up to ten years. Id. Violations of § 2257A are subject to a one-year maximum term of imprisonment, unless the violation involves an effort to conceal a substantive offense involving the use of a minor in sexually explicit depictions. Id. § 2257A(i)(1)–(3). In that case, the sentencing range is the same as the range for violating § 2257. Id. § 2257A(i)(2)–(3).

---

[2]     Producers do not include photo or film processors, distributors, or telecommunications service providers. 28 C.F.R. § 75.1(c)(4).

## B. Procedural History

The twelve plaintiffs "are a collection of individuals, commercial entities, and interest groups who are engaged in or represent others involved in the production of images covered under the Statutes," including two trade associations, Free Speech Coalition, Inc. ("FSC") and the American Society of Media Photographers ("ASMP").[3] FSC III, 825 F.3d at 156. The plaintiffs filed this lawsuit in 2009, seeking declaratory relief and an injunction against enforcement of the Statutes and regulations, based on the First Amendment and other

---

[3] Specifically, the plaintiffs are (1) FSC, "a trade association representing more than 1,000 member businesses and individuals involved in the production and distribution of adult materials"; (2) ASMP, "a trade association representing photographers"; (3) "Thomas Hymes, a journalist who operates a website related to the adult film industry"; (4) "Townsend Enterprises, Inc., doing business as the Sinclair Institute, a producer and distributor of adult materials created for the purpose of educating adults about sexual health and fulfillment"; (5) "Carol Queen, a sociologist, sexologist, and feminist sex educator"; (6) "Barbara Nitke, a faculty member for the School of Visual Arts in New York City and a photographer"; (7) "Marie L. Levine, also known as Nina Hartley, a performer, sex educator, and producer of adult entertainment"; (8) "Betty Dodson, a sexologist, sex educator, author, and artist"; (9) "Carlin Ross, who hosts a website with Dodson providing individuals ashamed of their genitalia with a forum for anonymously discussing and posting images of their genitalia"; and (10, 11, 12) "photographers Barbara Alper, David Steinberg, and Dave Levingston." FSC III, 825 F.3d at 156 n.3 (quotation marks omitted).

constitutional grounds. FSC I, 677 F.3d at 524–25. Since then, the case has reached us three times.

In this fourth appeal, only the plaintiffs' First Amendment challenges remain. The plaintiffs claim that the age verification, recordkeeping, and labeling requirements, and the attendant criminal penalties for noncompliance, violate the First Amendment as applied to them, and that the Statutes' requirements should be invalidated facially under the First Amendment overbreadth doctrine. We have considered the plaintiffs' First Amendment claims in our three previous decisions, so we describe those aspects of our prior opinions as relevant context.

### 1. FSC I

In this case's first appeal, we reviewed the District Court's order dismissing the plaintiffs' First Amendment as-applied and overbreadth claims. The District Court determined that the Statutes' requirements were content-neutral regulations of speech subject to intermediate scrutiny, and that the plaintiffs failed to state an as-applied or overbreadth claim. See Free Speech Coal., Inc. v. Holder, 729 F. Supp. 2d 691, 698, 726 (E.D. Pa. 2010).

Our decision in FSC I affirmed in part and vacated in part the District Court's order dismissing the plaintiffs' First Amendment claims, and remanded for further proceedings. 677 F.3d at 525. We agreed with the District Court that the Statutes' requirements were content-neutral regulations of speech subject to intermediate scrutiny, reasoning that "Congress singled out the types of depictions covered by the Statutes not because of their effect on audiences or any

disagreement with their underlying message but because doing so was the only pragmatic way to enforce its ban on child pornography." Id. at 534. We also agreed with the District Court that under intermediate scrutiny, the Statutes' requirements advance a substantial governmental interest in "protecting children from sexual exploitation by pornographers" and "leave open ample alternative channels of communication." See id. at 533, 535, 536 n.13. But we vacated the District Court's dismissal of the plaintiffs' as-applied and overbreadth claims because the plaintiffs should have been "afforded the opportunity to conduct discovery and develop the record regarding whether the Statutes are narrowly tailored," id. at 533, and "[t]he degree of the asserted overbreadth," id. at 538.

## 2. FSC II

Following our remand and the completion of discovery, the District Court held an eight-day bench trial in June 2013. See Free Speech Coal., Inc. v. Holder, 957 F. Supp. 2d 564, 568, 571 (E.D. Pa. 2013). In a post-trial opinion analyzing the evidence presented at trial, the District Court ruled that the Statutes' requirements and their implementing regulations survived intermediate scrutiny as applied to the plaintiffs, id. at 589, and that the plaintiffs' overbreadth claim failed, id. at 594.

On appeal, we affirmed the District Court's order denying the plaintiffs' First Amendment claims. See FSC II, 787 F.3d at 172. As a threshold matter, we held that the two association plaintiffs, FSC and ASMP, lacked associational standing to bring as-applied First Amendment claims on behalf of their members. We explained that for FSC and ASMP to

11

bring as-applied claims on behalf of their members, they had to show that their claims did not require an "individualized inquiry" for each member. Id. at 153–54. The two associations could not establish associational standing because under intermediate scrutiny, FSC and ASMP's as-applied claims turned on "the degree to which [each] individual producer's speech [was] unnecessarily burdened." Id. at 154. So, "[i]dentifying those members for whom the Statutes may be unconstitutional . . . require[d] an individualized inquiry." Id. Even though FSC's and ASMP's members "collectively produce a significant portion of the works generated by the adult film industry," that was insufficient for associational standing because "aggregating that industry's speech in toto [would be] an improper method for identifying the burdens imposed on specific members." Id. "Generalized statements regarding the adult film industry's speech" could not "replace the individualized inquiry required." Id. Thus, FSC and ASMP lacked associational standing to bring as-applied claims on behalf of their members. Id.

We also rejected the remaining ten plaintiffs' First Amendment as-applied claims. Under intermediate scrutiny, applying the Statutes to the plaintiffs served the Government's interest in protecting children by preventing the plaintiffs "from depicting minor performers, either purposefully or inadvertently," id. at 156, given that each plaintiff "employ[s] a substantial number of youthful-looking models" who look like they could be children but might, in fact, be young-looking adults, id. at 159. We recognized that the Statutes also cover circumstances when the plaintiffs create sexually explicit depictions of individuals who are unquestionably adults, and that regulating those depictions did "nothing" to protect children. Id. at 156. Still, the Statutes and regulations were

12

sufficiently tailored under intermediate scrutiny because the "qualitative" burden of compliance for clearly adult performers was "minimal," and intermediate scrutiny does not require using "the least restrictive" means. Id. at 152.

Last, we upheld the Statutes' requirements in the face of the plaintiffs' overbreadth challenge. Id. at 166. We credited the plaintiffs' showing that there were some impermissible applications of the Statutes to those who produced depictions of unquestionably adult performers, and to depictions created by, and exchanged between, consenting adults solely for private use. Id. at 164. Even so, after examining the evidence presented at trial concerning how widely those applications extend, we concluded that the "invalid applications of the Statutes . . . pale in comparison with the Statutes' legitimate applications," id., a decision buttressed by the "surpassing importance" of the governmental interest in protecting children, id. at 166.

### 3.  FSC III

After our decision in FSC II, the plaintiffs petitioned for panel rehearing based on the Supreme Court's then-new decision in Reed v. Town of Gilbert, 576 U.S. 155 (2015). According to the plaintiffs, the Reed decision dictated that the Statutes' requirements were content-based restrictions on speech, not content-neutral restrictions, and therefore should be reviewed under strict scrutiny, a standard more onerous than intermediate scrutiny. We granted panel rehearing to address that question and vacated our decision in FSC II. FSC III, 825 F.3d at 158.

13

On panel rehearing, we agreed with the plaintiffs that the Statutes' requirements were content-based restrictions on speech subject to strict scrutiny based on the Supreme Court's Reed decision. Id. at 153. There, the Supreme Court held that a town sign code was "content based on its face" because its restrictions "depend[ed] entirely on the communicative content of the sign." Reed, 576 U.S. at 164. In reaching that conclusion, the Court explained that if a law is "content based on its face," then that law "is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." Id. at 165 (quotation marks omitted). Following that instruction from Reed, we concluded that our prior analysis in FSC I — determining that intermediate scrutiny applied because the Statutes were enacted for content-neutral purposes — could not stand. FSC III, 825 F.3d at 160. We decided that the Statutes are content-based restrictions on their face and subject to strict scrutiny because they pertain only to visual depictions of actual or simulated sexually explicit conduct. Id. The Statutes' restrictions thus "'depend entirely on the communicative content' of the speech." Id. (quoting Reed, 576 U.S. at 164).

As a result, we remanded to the District Court to consider whether, under the more exacting strict scrutiny standard, (1) the two associations, FSC and ASMP, have associational standing to bring as-applied claims on behalf of their members, (2) the Statutes' requirements violate the First Amendment as applied to the plaintiffs, and (3) those requirements should be invalidated facially for overbreadth. Remand was necessary because "the level of scrutiny [was] relevant in resolving" those issues. Id. at 164 n.12, 173.

14

### 4. The District Court's Decision Following the FSC III Remand

After our decision to remand in FSC III and the opportunity to supplement the record, the parties cross-moved for entry of judgment on the First Amendment claims. The District Court first held that FSC and ASMP lack associational standing to bring as-applied First Amendment claims on behalf of their members. Then, for the remaining plaintiffs' as-applied claims, the District Court ruled that the age verification requirement survives the First Amendment as applied to primary producers, but violates the First Amendment as applied to secondary producers; that the recordkeeping and labeling requirements violate the First Amendment as applied to both primary and secondary producers; and that the Statutes' criminal penalties violate the First Amendment to the extent they are used to enforce requirements that themselves are unconstitutional. Next, the District Court denied the plaintiffs' overbreadth claim because they failed to meet their burden of showing that the unconstitutional applications of the Statutes render them substantially overbroad. Finally, based on the successful as-applied claims, the District Court determined that the plaintiffs are entitled to an injunction prohibiting all enforcement of the requirements it found to be unconstitutional.

The plaintiffs and the Government timely cross-appealed. Together, the cross-appeals put all of the above District Court rulings at issue.[4]

---

[4] The District Court also enjoined enforcement of the Statutes' inspection provisions, which require producers to

---

15

## II. FIRST AMENDMENT

We begin by considering the District Court's First Amendment rulings.[5]  We review legal questions about a party's standing to sue and the constitutionality of federal laws de novo.  In re Subpoena 2018R00776, 947 F.3d 148, 154 (3d Cir. 2020); Freedom From Religion Found., Inc. v. Cnty. of Lehigh, 933 F.3d 275, 279 (3d Cir. 2019).  Ordinarily, we will not disturb factual findings following a bench trial absent clear error.  Covertech Fabricating, Inc. v. TVM Bldg. Prods., Inc., 855 F.3d 163, 169 (3d Cir. 2017).  But for those facts relevant to First Amendment claims, we "have a duty to engage in a searching, independent factual review of the full record," ACLU v. Mukasey, 534 F.3d 181, 186 (3d Cir. 2008) (quotation marks omitted), because "the reaches of the First Amendment are ultimately defined by the facts it is held to embrace," Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., 515 U.S. 557, 567 (1995).  Our independent review of

---

make the records required by the Statutes "available to the Attorney General for inspection at all reasonable times."  18 U.S.C. §§ 2257(c), 2257A(c); see also id. §§ 2257(f)(5), 2257A(f)(5) (making it unlawful to "refuse to permit" the Attorney General to conduct such an inspection); 28 C.F.R. § 75.5 (implementing regulation for inspection requirement). The District Court entered that relief because we held in FSC III that the inspection provisions "are facially unconstitutional under the Fourth Amendment."  825 F.3d at 154.  In this cross-appeal, no party contests that aspect of the District Court's order.

[5] The District Court had jurisdiction under 28 U.S.C. § 1331.  We have jurisdiction under 28 U.S.C. § 1291.

the record, therefore, is necessary to ensure that "the judgment does not constitute a forbidden intrusion on the field of free expression." Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 499 (1984).

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Ashcroft v. ACLU, 535 U.S. 564, 573 (2002) (alteration in original) (quotation marks omitted). Such content-based laws "have the constant potential to be a repressive force in the lives and thoughts of a free people." Ashcroft v. ACLU ("Ashcroft II"), 542 U.S. 656, 660 (2004). "To guard against that threat," id., the First Amendment requires that we apply "strict scrutiny" to content-based restrictions on speech, Reed, 576 U.S. at 163–64. Under strict scrutiny, a content-based restriction is "presumptively unconstitutional," id. at 163, and may be justified only if the Government shows that the restriction "(1) serves a compelling governmental interest; (2) is narrowly tailored to achieve that interest; and (3) is the least restrictive means of advancing that interest," In re Subpoena 2018R00776, 947 F.3d at 156 (alterations and quotation marks omitted).

We previously determined that the Statutes' requirements are content-based restrictions subject to strict scrutiny because the Statutes apply only when visual depictions show "actual sexually explicit conduct" or "simulated sexually explicit conduct." FSC III, 825 F.3d at 160 (quoting 18 U.S.C. §§ 2257(a)(1), 2257A(a)(1)). The Statutes' restrictions therefore "'depend entirely on the

17

communicative content' of the speech." Id. (quoting Reed, 576 U.S. at 164). We also determined that the plaintiffs do not dispute the compelling interest prong of the strict scrutiny test. The plaintiffs conceded that "the Government's interest in protecting children from sexual exploitation by pornographers is compelling." Id. at 164 n.11.[6] In the analysis that follows, we consider FSC's and ASMP's associational standing to bring as-applied claims on behalf of their members, as well as the merits of the plaintiffs' as-applied and overbreadth claims.

## A. Associational Standing

We first address FSC's and ASMP's associational standing to bring as-applied claims on behalf of their members. We will affirm the District Court's order dismissing the two associations' as-applied claims for lack of standing.

"Article III of the Constitution limits federal courts to deciding 'Cases' and 'Controversies.'" Dep't of Commerce v. New York, 139 S. Ct. 2551, 2565 (2019) (quoting U.S. Const. art. III, § 2, cl. 1). "For a legal dispute to qualify as a genuine case or controversy," a plaintiff "must have standing to sue," id., and an association may have such standing "as a representative of its members," Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc., 280 F.3d 278, 283 (3d Cir. 2002). Associational standing requires an association to show that (1)

---

[6] The plaintiffs dispute whether the problems the Statutes aim to solve are real. We already rejected that argument in our FSC I decision, so we need not rehash that issue here. See 677 F.3d at 535 (rejecting plaintiffs' argument that the Government failed to show "the problems identified are real, not conjectural").

18

its "members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Id. (quoting Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977)).

While the first two prongs of the associational standing test derive from Article III's case-or-controversy requirement, ensuring that a representative association has "a stake in the resolution of the dispute," the third prong is a prudential "judicially self-imposed" limit for "administrative convenience and efficiency." United Food & Com. Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. 544, 554–57 (1996) (quotation marks omitted). The third prong's requirement — that "neither the claim asserted nor the relief requested requires the participation of individual members" — protects "against the hazard of litigating a case . . . only to find" that the representative association lacks "detailed records or the evidence necessary to show . . . harm with sufficient specificity." Id. at 553, 556 (quotation marks omitted). For that reason, "conferring associational standing" is "improper for claims requiring a fact-intensive-individual inquiry." Pa. Psychiatric Soc'y, 280 F.3d at 286; see also Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 289 (3d Cir. 2014) (concluding organization lacked standing to sue on behalf of its members because of the "highly individualized nature" of the claims).

When we applied intermediate scrutiny to FSC's and ASMP's as-applied claims on behalf of their members, we decided that the associations could not satisfy the third prong of the associational standing test. FSC II, 787 F.3d at 154.

19

FSC's and ASMP's as-applied claims required their members' individual participation because the narrow tailoring inquiry raised "whether the Statutes and regulations are sufficiently circumscribed" as applied to the "specific conduct" of each member. Id. at 153. Despite FSC's and ASMP's attempt to escape that standing defect by converting their as-applied claims on behalf of their members into a collective one on behalf of the "entire adult film industry," we rejected that theory. Id. "[N]either FSC nor ASMP represents 'the adult film industry' as a whole," id., and even though their members "collectively produce a significant portion of the works generated by the adult film industry, aggregating that industry's speech in toto is an improper method for identifying the burdens imposed on specific members," id. at 154. "Generalized statements regarding the adult film industry's speech" could not "replace the individualized inquiry required." Id.

FSC and ASMP argue that the outcome should be different now because under strict scrutiny, individualized inquiry for each of their members is no longer necessary. In support, they claim that if the Government fails to rebut a less restrictive alternative as to one association member, the Statutes violate the First Amendment as applied to all of FSC's and ASMP's members.

The associations' argument is unavailing. An as-applied claimant "asserts that the acts of his that are the subject of the litigation fall outside what a properly drawn prohibition could cover." Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 482 (1989); see also Tineo v. Att'y Gen., 937 F.3d 200, 210 (3d Cir. 2019) (explaining that an as-applied equal protection challenge turned on the plaintiff's "particular

20

circumstances at hand"). Strict scrutiny does not change the individualized inquiry required for an as-applied claim: An "as-applied attack" to a content-based restriction contends that a law's "application to a particular person under particular circumstances deprived that person of a constitutional right." United States v. Marcavage, 609 F.3d 264, 273 (3d Cir. 2010); see also Telescope Media Grp. v. Lucero, 936 F.3d 740, 754 (8th Cir. 2019) ("In an as-applied challenge . . . , the focus of the strict-scrutiny test is on the actual speech being regulated, rather than how the law might affect others who are not before the court."). Under strict scrutiny, FSC's and ASMP's as-applied claims still require an individualized inquiry for each association member.

That FSC's and ASMP's individual members work in many different facets of the adult film industry illustrates our conclusion. FSC highlights that it has "about 800 members" who engage in producing and distributing sexually explicit depictions, ranging from directors, producers, writers, cameramen, and lighting technicians, to sellers of sexually explicit depictions farther down the "stream of commerce." Pls. Br. 40 (quotation marks omitted). And ASMP emphasizes that its "some 400" photographers take sexually explicit photographs across a "broad range of genres." Id. Given the diversity of circumstances presented by FSC's and ASMP's membership, "facts matter, and what may be narrowly drawn and the least restrictive means" for one association member "will not necessarily be so" for another. Marcavage, 609 F.3d at 288; see also Ayotte v. Planned Parenthood of N. New Eng., 546 U.S. 320, 329 (2006) ("It is axiomatic that a statute may be invalid as applied to one state of facts and yet valid as applied to another." (quotation marks omitted)). FSC's and ASMP's as-applied claims require individualized inquiry, and

21

the two associations therefore lack standing to bring those claims on behalf of their members.

## B.  As-Applied Claims

We next turn to the ten other plaintiffs' as-applied claims.  The remaining plaintiffs contend that the Statutes' age verification, recordkeeping, and labeling requirements, and the regulations that implement those requirements, violate the First Amendment.  They separately assert that the criminal penalties for noncompliance with the Statutes' requirements cannot withstand scrutiny under the First Amendment.  We address these as-applied claims in turn.

### 1.  Age Verification, Recordkeeping, and Labeling Requirements

The District Court upheld the age verification requirement as applied to primary producers, but invalidated that requirement as applied to secondary producers.  In addition, the District Court struck down the recordkeeping and labeling requirements as applied to both primary and secondary producers.  We will affirm in part and reverse in part.  We conclude that for the plaintiffs with standing to bring as-applied claims, the age verification, recordkeeping, and labeling requirements all violate the First Amendment.

The plaintiffs argue that the age verification, recordkeeping, and labeling requirements violate the First Amendment as applied to them.  They propose that as applied, Congress could have used a less restrictive alternative by limiting the age verification, recordkeeping, and labeling requirements to circumstances where a performer in a sexually

explicit depiction "might reasonably appear" to be a child. Pls. Br. 24. The plaintiffs explain that when a performer in a sexually explicit depiction is a "mature adult[]," there is no chance that the performer might be a child. Pls. Br. 26. So, the plaintiffs' argument goes, because the age verification, recordkeeping, and labeling requirements apply regardless of a performer's age, the requirements unnecessarily restrict the plaintiffs' speech when there is no risk a child was harmed.

We agree. The age verification, recordkeeping, and labeling requirements protect children when a sexually explicit depiction shows a young-looking performer who could be a child. In that circumstance, the requirements serve the Government's compelling interest in protecting children by ensuring that producers of sexually explicit depictions "confirm" performers are not children, preventing "children from passing themselves off as adults" to producers, and eliminating "subjective disputes" over whether a producer should have verified a performer's age. FSC I, 677 F.3d at 535. But the age verification, recordkeeping, and labeling requirements need not prevent all mistakes about age to protect children from sexual exploitation. The requirements "do not advance the Government's interest" when sexually explicit depictions show "performers whom no reasonable person could mistake" for a child. FSC II, 787 F.3d at 157.

After our decision to remand for the application of strict scrutiny, the Government conceded in the District Court that "the age range where there is a real possibility of mistaking a child for an adult extends to 30 years old," and highlighted that it had "never taken the position" that children "could be confused for clearly mature adults," at least when "the individuals depicted are clearly visible in the image." District

Court Docket Index ("D.I.") 265 at 13. Nor could it have because the Government's expert on pubertal maturation, Francis Biro, testified at trial that "the vast majority of adults 30 years of age or older could not be mistaken for a minor." FSC II, 787 F.3d at 156 (quotation marks omitted).

Based on that point, the Government argued, if "the Statutes do not survive strict scrutiny in their entirety," they should be invalidated "only to the extent that they apply to plaintiffs' production of images showing clearly mature adults over the age of 30." D.I. 265 at 18 n.12, 19 (capitalization omitted). According to the Government, the Statutes would still "function effectively as an independent whole" because "the core goals" of the Statutes "are served by applying the Statutes to images showing young-looking people, even if no records are required for" performers who are clearly adults. D.I. 265 at 18–19 n.12, 22. Later, at oral argument in this appeal, the Government confirmed that its position for the plaintiffs' as-applied claims was to limit the Statutes "to images depicting young people under 30 years of age." (Oral Arg. Tr. 6:3-8.)

The Government's concessions mean that as applied to the plaintiffs, the age verification, recordkeeping, and labeling requirements could be less restrictive if they did not apply when the plaintiffs depict performers who are at least thirty years old and the performer is clearly shown in the depiction. The record confirms that a substantial percentage of the plaintiffs' performers are at least thirty years old: 55% for

Dodson and Ross,[7] 59.7% for Levine, 40% for Levingston, 52.63% for Nitke, 66.02% for the Sinclair Institute, and 76% for Steinberg. See FSC II, 787 F.3d at 158. Likewise, the "vast majority" of participants in Queen's live-streamed show were in their thirties and forties. Id. Although the record does not reflect the age breakdowns of the performers in the depictions that Alper creates or the depictions that Hymes posts on his website, the Government bears the burden of disproving the plaintiffs' proposed alternative. Quite the opposite of making that showing, the Government agrees that all of the "plaintiffs are unlike the mine run of pornography producers because they do not generally cater to the marketplace's appetite for viewing young-looking people in sexually explicit depictions." Gov't Reply Br. 47. For these plaintiffs, then, there is a "less restrictive alternative" that "would serve the Government's purpose." United States v. Playboy Ent. Grp., Inc., 529 U.S. 803, 813 (2000). The age verification, recordkeeping, and

---

[7] The Government argues that limiting the Statutes' requirements to producers of sexually explicit depictions clearly showing performers who are at least thirty years old would not be any less restrictive for plaintiffs Dodson and Ross, specifically, because their website displays anonymous pictures of genitals, so performers are not clearly shown in those images. The Government's point is not borne out by the record. Dodson and Ross also produce other sexually explicit depictions that do clearly show performers who are at least thirty years old. See D.I. 221 (Trial Tr. 159:16-17, 160:7-12, 162:19–163:18) (Ross testifying that Dodson and Ross have produced sexually explicit depictions showing performers over age thirty). Therefore, under the plaintiffs' proposed alternative, the Statutes would be less restrictive for these two plaintiffs.

25

labeling requirements restrict the plaintiffs' "speech without an adequate justification, a course the First Amendment does not permit." Id.

The Government sets out to save the Statutes' requirements, as applied to the plaintiffs, by relying on a reason we gave when we upheld the Statutes under intermediate scrutiny: the plaintiffs "do not face a substantial additional burden attributable to keeping records for clearly mature performers on top of the records they must maintain for young performers" because "most of the burden" the plaintiffs "face under the Statutes is due to the procedures they must put in place to store, organize, and make available records for performers generally." FSC II, 787 F.3d at 159. Based on that intermediate scrutiny reasoning, the Government asserts that the age verification, recordkeeping, and labeling requirements should pass strict scrutiny, as well.

We are not convinced. The number of older performers employed by the plaintiffs "is not insignificant," and requiring age verification, recordkeeping, and labeling for depictions of those clearly adult performers "does not protect children." Id. at 158. Strict scrutiny demands that "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." Playboy Ent. Grp., Inc., 529 U.S. at 813. The availability of a less restrictive alternative for these plaintiffs thus makes clear that the age verification, recordkeeping, and labeling requirements violate the First Amendment as applied to them.[8]

---

[8] The plaintiffs propose several other alternatives to the Statutes' requirements that they claim would make the Statutes

## 2. Criminal Penalties

We consider separately the plaintiffs' as-applied challenge to the Statutes' criminal penalties attached to violations of the Statutes' age verification, recordkeeping, and labeling requirements. The District Court held that the criminal penalties cannot be applied to enforce restrictions that themselves violate the First Amendment. We will affirm, but we reach that conclusion on different grounds than the District Court.

The plaintiffs posit that regardless of whether the age verification, recordkeeping, and labeling requirements are constitutional, the attendant statutory criminal penalties should be invalidated under the First Amendment. In the plaintiffs' view, because the Statutes' penalties are criminal in kind, they are too harsh and would be less restrictive if they were administrative sanctions instead. The District Court relied on this reasoning when it invalidated the Statutes' criminal penalties.

The plaintiffs' reasoning does not persuade us. The plaintiffs have not cited any authority for their position that under the First Amendment, we may strike down the penalty for noncompliance with a restriction on speech only because the penalty is criminal in kind. We have not found any authority for that position, either. To the contrary, three reasons lead us to conclude that the Statutes' penalties do not

less restrictive as applied to them. Given our as-applied ruling for the plaintiffs, we need not address those alternatives.

offend the First Amendment simply because of their criminal character.

First, the kind of penalty that Congress chose is not, by itself, subject to First Amendment review because a penalty for noncompliance with a restriction on speech is not equivalent to a restriction on speech. See Long Beach Area Peace Network v. City of Long Beach, 574 F.3d 1011, 1032–33 (9th Cir. 2009) (distinguishing First Amendment review of an ordinance restricting speech from the "misdemeanor penalty" attached to a violation of the ordinance's restriction); Christine Jolls, Cass R. Sunstein & Richard Thaler, A Behavioral Approach to Law and Economics, 50 Stan. L. Rev. 1471, 1517 (1998) ("[N]o one has suggested that the First Amendment imposes limits on the severity of punishment for speech that the government is entitled to criminalize."). The distinction between a restriction on speech and a penalty for a violation of that restriction is central. Whether the consequence for noncompliance with the Statutes is a criminal punishment or an administrative sanction, the Statutes require the plaintiffs to verify performers' ages and identities, keep records of performers' identification documents, and label their depictions with the locations of those records. So the Statutes impose no more restrictions on the plaintiffs' speech because the penalties for noncompliance are criminal, and would impose no fewer restrictions if the penalties were administrative. As a result, the kind of penalty that Congress chose is not a basis to decide that the Statutes could be less restrictive.

Second, the plaintiffs' position does not comport with the Supreme Court's First Amendment jurisprudence. Their position boils down to an assertion that a less severe penalty should be more likely to survive First Amendment review

28

because a less severe penalty is less restrictive of speech. That does not accord with the Supreme Court's recognition that the First Amendment shields against governmental efforts to restrict free speech even when enforced through "trivial" forms of punishment. Rutan v. Republican Party of Ill., 497 U.S. 62, 75 n.8 (1990). Nor can the plaintiffs' position be reconciled with the Supreme Court's determination that even though a state racketeering statute provided "stiffer" and "obviously greater" criminal penalties than the penalties attached to a predicate offense, the difference in the severity of the punishments was not "constitutionally significant" for a First Amendment challenge to the racketeering statute. Fort Wayne Books, Inc. v. Indiana, 489 U.S. 46, 59, 60 (1989). Of course, a severe criminal penalty can have a chilling effect on speech. See Ashcroft II, 542 U.S. at 660 ("Content-based prohibitions, enforced by severe criminal penalties, have the constant potential to be a repressive force in the lives and thoughts of a free people."). But that deterrent effect, alone, does not warrant invalidating a penalty on First Amendment grounds. See Fort Wayne Books, Inc., 489 U.S. at 59, 60 (rejecting argument that "sanctions imposed" were so "draconian" that they had "an improper chilling effect on First Amendment freedoms" because "[t]he mere assertion of some possible self-censorship" was "not enough" to render a statute "unconstitutional").

Third, when restrictions of speech survive constitutional scrutiny, it is not for federal courts to limit Congress "in resorting to various weapons in the armory of the law" to enforce those restrictions. Kingsley Books, Inc. v. Brown, 354 U.S. 436, 441 (1957); accord Fort Wayne Books, Inc., 489 U.S. at 60. Whether violations of the Statutes' requirements are "to be visited by a criminal prosecution" or some other

29

administrative penalty is "a matter within the legislature's range of choice." Kingsley Books, Inc., 354 U.S. at 441. This point carries even greater weight when Congress chooses to rely on criminal penalties for enforcement because "[r]eviewing courts . . . should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." Solem v. Helm, 463 U.S. 277, 290 (1983); see also United States v. Bajakajian, 524 U.S. 321, 336 (1998) ("[J]udgments about the appropriate punishment for an offense belong in the first instance to the legislature."); Gore v. United States, 357 U.S. 386, 393 (1958) ("Whatever views may be entertained regarding severity of punishment, . . . these are peculiarly questions of legislative policy.").

On the other hand, the Government may not enforce penalties for noncompliance with laws that the Constitution prohibits. We therefore ultimately arrive at the same conclusion the District Court reached: because we have concluded that the age verification, recordkeeping, and labeling requirements violate the First Amendment as applied to some of the plaintiffs, the criminal penalties for violating those provisions cannot be applied to those plaintiffs, either.

C. Overbreadth Claim

The plaintiffs also levy a facial attack on the Statutes' requirements under the First Amendment overbreadth

30

doctrine.[9]  We will affirm the District Court's order denying the plaintiffs' overbreadth claim.

A law may be invalidated facially as "overbroad" if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." United States v. Stevens, 559 U.S. 460, 473 (2010) (quotation marks omitted).  An "overbreadth claimant bears the burden of demonstrating, from the text of the law and from actual fact, that substantial overbreadth exists."  Virginia v. Hicks, 539 U.S. 113, 122 (2003) (alterations and quotation marks omitted); see also Stevens, 559 U.S. at 481 (invalidating a content-based statute for substantial overbreadth because "the presumptively impermissible applications" of the challenged statute "far outnumber any permissible ones").

---

[9]  Ordinarily, we do not reach an overbreadth claim when presented with a successful as-applied claim because "[i]t is not the usual judicial practice . . . nor . . . generally desirable, to proceed to an overbreadth issue unnecessarily." Fox, 492 U.S. at 484–85.  Here, however, only some plaintiffs have standing to bring as-applied claims. See supra Section II.A. Thus, we confront the plaintiffs' other First Amendment challenge based on overbreadth.  Indeed, "[t]he First Amendment doctrine of overbreadth was designed as a departure from traditional rules of standing, to enable persons who are themselves unharmed by the defect in a statute nevertheless to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court."  Fox, 492 U.S. at 484 (quotation marks and citation omitted).

"The first step in overbreadth analysis is to construe the challenged statute" because "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." United States v. Williams, 553 U.S. 285, 293 (2008). We decided before that "the plain language of the Statutes makes clear that they apply broadly to all producers of actual or simulated sexually explicit depictions regardless of whether those depictions were created for the purpose of sale or trade." FSC I, 677 F.3d at 539. As a result, the "Statutes reach essentially the entire universe of sexually explicit images, 'including private, noncommercial depictions created and viewed by adults in their homes.'" FSC II, 787 F.3d at 161 (quoting FSC I, 677 F.3d at 538). Nothing about the scope of the Statutes has changed since we last considered the question, so we reach the same conclusion here.

To succeed on their overbreadth claim, the plaintiffs must carry the burden of establishing that invalid applications of the Statutes make them substantially overbroad. That is because the overbreadth doctrine "seeks to strike a balance between competing social costs." Williams, 553 U.S. at 292. On one side of the scale, "the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas." Id. On the other side of the scale, "invalidating a law that in some of its applications is perfectly constitutional — particularly a law directed at conduct so antisocial that it has been made criminal — has obvious harmful effects." Id. To "maintain an appropriate balance," the Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." Id. So when addressing whether a law suffers from substantial overbreadth,

we must weigh "'the number of valid applications' of the statute," "the historic or likely frequency of conceivably impermissible applications," "the nature of the [government's] interest underlying the regulation," and "the nature of the activity or conduct sought to be regulated." FSC I, 677 F.3d at 537–38 (quoting Gibson v. Mayor & Council of Wilmington, 355 F.3d 215, 226 (3d Cir. 2004)).

We balanced those factors when we rejected the plaintiffs' overbreadth claim in our previous opinion, which was vacated following the Supreme Court's decision in Reed. See FSC II, 787 F.3d at 160–66. Those factors still counsel against invalidating the Statutes' requirements for overbreadth because our prior analysis continues to resonate. See Real Alts. Inc. v. Sec'y Dep't of Health & Human Servs., 867 F.3d 338, 356 n.18 (3d Cir. 2017) (observing that although a vacated opinion was not "controlling," it remained persuasive).

1. Valid Applications

Our prior reasoning with respect to the Statutes' valid applications retains its force. We explained that the Statutes' requirements validly apply when producers create sexually explicit depictions showing young-looking performers who could be children. FSC II, 787 F.3d at 161. We determined that this "legitimate sweep of the Statutes is vast" because a careful examination of the expert testimony at trial revealed that there is a substantial universe of online pornography depicting young-looking performers. Id. For instance, the Government's expert, Gail Dines, identified that "the top three pornographic Internet websites contain 17.97 million pages" with "words clearly related to young adults," amounting to "34.2% of all pages within these pornographic sites." Id.

33

(footnote omitted). And, that 17.97 million-page estimate understated "the full swath of sexually explicit materials to which the Statutes validly apply." Id. at 162. Moreover, "after examining all 61 categories of pornographic material on a top pornographic website — at the time, the 40th most visited website in the United States — Dines found that the overriding image is of a youthful looking woman." Id. (quotation marks omitted). It is clear that the Statutes' valid applications are extensive.

## 2. Impermissible Applications

Our analysis of the impermissible applications of the Statutes continues to counsel against overbreadth, as well. We previously reasoned that the Statutes impermissibly apply to (1) producers of sexually explicit depictions exclusively showing individuals who are clearly adults, FSC II, 787 F.3d at 156, and (2) adults who share sexually explicit images between themselves for purely private purposes, id. at 163 & n.14. As to the first, we explained that applying the Statutes when depictions show an individual who is clearly an adult "does nothing" to further the Government's interest in protecting children. Id. at 156. As to the second, the Government had not tried to defend the constitutionality of applying the Statutes to purely private sexually explicit depictions shared between consenting adults. Id. at 163 n.14.

The plaintiffs do not contest our prior weighing of these two invalid applications against the Statutes' vast legitimate sweep. Based on the evidence presented at trial, the plaintiffs showed "to a limited degree, a universe of sexually explicit images that depict only clearly mature adults," and a "universe of private sexually explicit images not intended for sale or

34

trade." Id. at 164. Even so, without reducing our inquiry into a purely numerical comparison, we concluded that the scope of the two invalid applications of the Statutes "pale[s] in comparison" to the Statutes' legitimate sweep, which "counsels against holding the Statutes facially invalid." Id.

Rather than challenge that evaluation of the record, the plaintiffs assert that our balancing of the Statutes' invalid applications against their valid applications should come out differently now because the District Court found the Statutes invalid as applied in a third circumstance: to secondary producers who play no role in the creation of sexually explicit content. In their view, adding that additional unconstitutional application "magnifie[s]" the Statutes' "overreach." D.I. 246 at 17.[10]

We are not convinced. The plaintiffs have not carried their heavy burden of showing that we should resort to the "strong medicine" of the overbreadth doctrine to facially invalidate the Statutes, a tool to be used "sparingly and only as a last resort." Broadrick v. Oklahoma, 413 U.S. 601, 613

_____

[10] To the extent the plaintiffs argue that a content-based regulation must be narrowly tailored to survive an overbreadth challenge, see, e.g., Pls. Reply Br. 14–15, we disagree. "Although overbreadth and narrow tailoring are related, the Supreme Court has rejected the . . . assertion that [a law] must precisely target the acts it was passed to remedy." Turco v. City of Englewood, 935 F.3d 155, 171 (3d Cir. 2019) (footnote omitted) (citing Hill v. Colorado, 530 U.S. 703, 730–31 (2000) ("The fact that the coverage of a statute is broader than the specific concern that led to its enactment is of no constitutional significance")).

(1973). We assume without deciding that applying the Statutes to secondary producers violates the First Amendment. Nevertheless, missing from the plaintiffs' argument is any specific explanation regarding how much larger this makes the swath of invalid applications and why this particular application should tip the overbreadth scale in their favor.

For example, the plaintiffs have not argued how widely the universe of secondary producers extends as compared to the Statutes' legitimate sweep. And the plaintiffs make no effort to show how many producers of sexually explicit depictions are exclusively secondary producers. That is significant because "[t]he same person may be both a primary and a secondary producer." 28 C.F.R. § 75.1(c)(3). Excluding from the Statutes' coverage those secondary producers who occupy a dual role, then, would do little, if anything, to reduce the Statutes' supposed overreach because those secondary producers would still need to comply as primary producers. These omissions doom the plaintiffs' overbreadth claim. At bottom, the plaintiffs have failed to prove "from actual fact" that the Statutes' application to secondary producers renders the Statutes substantially overbroad. Virginia, 539 U.S. at 122 (quotation marks omitted).

3. Nature of the Government's Interest and of the Activity Targeted

Last, when we rejected the plaintiffs' overbreadth claim previously, we underscored the "'surpassing importance' of the Government's compelling interest" in protecting children from sexual exploitation by pornographers and the nature of the activity that the Statutes aim to regulate. FSC II, 787 F.3d at 166 (quoting New York v. Ferber, 458 U.S. 747, 757

36

(1982)). Those factors still counsel against invalidating the Statutes for overbreadth.

"Child pornography harms and debases the most defenseless of our citizens," Williams, 553 U.S. at 307, and "[t]he sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people," Ashcroft v. Free Speech Coal., 535 U.S. 234, 244 (2002). And the Statutes aim to "stem the tide of child pornography only after" Congress found "direct prohibitions" on child pornography to be "insufficiently effective." FSC II, 787 F.3d at 166. "The financial benefits accruing to producers from using youthful models as well as the financial benefits those models themselves enjoy, together with the difficulty of differentiating youthful adults from minors, all combine to increase the risks of children being exploited." Id.

\* \* \*

Ultimately, the plaintiffs have not carried their burden of proving that the Statutes' requirements are substantially overbroad. We therefore will affirm the District Court's order denying the plaintiffs' overbreadth claim.

## III. INJUNCTION

Last, the Government argues that the District Court erred in entering, as the Government describes it, a "nationwide injunction." Gov't Br. 37. We review a district court's entry of a permanent injunction for abuse of discretion. eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006). "A district court abuses its discretion if its decision rests on an incorrect legal standard, a clearly erroneous factual finding, or

37

a misapplication of the law to the facts." <u>TD Bank N.A. v. Hill</u>, 928 F.3d 259, 270 (3d Cir. 2019).

The District Court entered a permanent injunction against enforcement of the provisions that it held were unconstitutional as applied to ten plaintiffs, but the injunction prohibited the Government from enforcing those provisions against any producer subject to the Statutes. For that reason, the Government contends that the injunction provided more relief than necessary to the few plaintiffs who succeeded on their as-applied claims only.[11]

We agree. Although a district court has "considerable discretion in framing injunctions," that discretion is cabined. <u>Meyer v. CUNA Mut. Ins. Soc'y</u>, 648 F.3d 154, 169 (3d Cir. 2011). "An injunction is a drastic and extraordinary remedy,

---

[11] In briefing, the Government refers to the relief entered as a nationwide injunction. That terminology strikes us as imprecise. The issue that the Government raises is not the geographic scope of the injunction. <u>See</u> <u>Trump v. Hawaii</u>, 138 S. Ct. 2392, 2425 n.1 (2018) (Thomas, J., concurring) (explaining that although "'[n]ationwide injunction[]' is perhaps . . . more common," the "term 'universal injunction[]'" is "more precise" when the "geographic breadth" of the contested injunction is not what makes it "distinctive"). Rather, the Government challenges the universal character of the injunction because the Government contests whether the District Court properly enjoined it from enforcing the Statutes' requirements against those who are not parties here. <u>See</u> <u>id.</u> (noting that universal injunctions "are distinctive because they prohibit the Government from enforcing a policy with respect to anyone, including nonparties").

which should not be granted as a matter of course." <u>Monsanto Co. v. Geertson Seed Farms</u>, 561 U.S. 139, 165 (2010). "[I]njunctive relief should be no broader than necessary to provide full relief to the aggrieved party." <u>Meyer</u>, 648 F.3d at 170 (quoting <u>Ameron, Inc. v. U.S. Army Corps of Eng'rs</u>, 787 F.2d 875, 888 (3d Cir. 1986)). "We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force." <u>Ayotte</u>, 546 U.S. at 328–29. In this case, enjoining enforcement against all producers covered by the Statutes was not consistent with the sound exercise of discretion for precisely those reasons: the injunction, an extraordinary remedy, afforded more relief than necessary to the ten plaintiffs who prevailed on their claims that the Statutes and regulations violate the First Amendment as applied to their specific circumstances.[12]

In defense of the scope of the injunction, the plaintiffs rely on two Supreme Court decisions, <u>Whole Woman's Health v. Hellerstedt</u>, 136 S. Ct. 2292 (2016), and <u>Citizens United v. FEC</u>, 558 U.S. 310 (2010), for the proposition that a successful as-applied challenge may lead to broader relief. But those two decisions do not apply here because in each, the Supreme Court

---

[12] The Government also claims that the District Court lacked the constitutional power to enter a nationwide injunction based on the plaintiffs' successful as-applied claims. We decline the invitation to answer that question because "we must avoid deciding a constitutional question if the case may be disposed of on some other basis." <u>Doe v. Pa. Bd. of Prob. & Parole</u>, 513 F.3d 95, 102 (3d Cir. 2008). Here, even if the District Court had the constitutional power to grant the injunction, our "jurisprudence governing injunctive remedies will not permit it." <u>Ameron</u>, 787 F.2d at 890.

relied on the principle that an as-applied constitutional attack may result in broader relief if the attack reveals that a law is invalid "across the board." Whole Woman's Health, 136 S. Ct. at 2307; see also Citizens United, 558 U.S. at 333 (reasoning that in "the exercise of its judicial responsibility" it may be "necessary . . . for the Court to consider the facial validity" of a statute, even though a facial challenge was not brought).

That principle is inapplicable here. The plaintiffs' as-applied claims do not show that the Statutes are invalid as applied to all producers covered by the Statutes. Most critically, the successful as-applied plaintiffs often feature older individuals in their sexually explicit depictions — a factual circumstance at the center of their successful as-applied claims and one which sets the plaintiffs apart from the more typical category of pornographers who rely on young-looking performers. Furthermore, the successful as-applied plaintiffs are not what may be considered ordinary pornographers. In its post-trial opinion, the District Court found that four of the plaintiffs — Steinberg, Alper, Levingston, and Nitke — are commercial photographer-artists, Free Speech Coal., Inc., 957 F. Supp. 2d at 572–73; five others — Queen, Ross, Dodson, Levine, and the Sinclair Institute — produce sex education materials, id. at 574, 575; and the last, Hymes, is a journalist, id. at 574. And all of these plaintiffs, save Sinclair, are "niche" players in the adult pornography industry who take "unique and often creative approaches to sexually explicit conduct." Id. at 583. The plaintiffs' meritorious as-applied claims, thus, were not a sound basis to enjoin enforcement of the Statutes' unconstitutional requirements against all other producers of sexually explicit depictions, whose circumstances may be different.

Accordingly, we will vacate the District Court's order entering a nationwide injunction and remand for the entry of relief limited to the successful as-applied plaintiffs.

## IV. CONCLUSION

For these reasons, we will affirm in part, reverse in part, and vacate in part the District Court's order entered on August 6, 2018, and will remand for proceedings consistent with this opinion.